Filed 11/18/21  Law Offices of Benjamin Pavone v. Willis CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| LAW OFFICES OF BENJAMIN PAVONE, PC et al., <br><br> Plaintiffs, Cross-defendants, and Appellants, <br><br> v. <br><br> MYZSA WILLIS, <br><br> Defendant, Cross-complainant, and Respondent. | D075817 <br><br><br><br><br> (Super. Ct. No. 37-2017-00007364-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Pavone & Fonner; Law Office of Benjamin Pavone and Benjamin Pavone in pro. per., for Plaintiffs, Cross-defendants and Appellants.

No appearance by Defendant, Cross-complainant, and Respondent.

Plaintiffs and Cross-defendants Law Offices of Benjamin Pavone, PC (LOBP) and Pavone & Fonner, LLP (P&F, and together with LOBP, Firms) filed an action to recover attorney fees against defendant and cross-complainant Myzsa Willis (Willis) and defendants McCall Prentice (McCall) and Jerne Willis (Jerne).  In turn, Willis filed a cross-complaint against Firms and cross-defendant Benjamin Pavone (together Cross-defendants), alleging fraud, breach of contract, professional negligence, and other cross-

claims. After a trial, the jury returned special verdicts that found, inter alia, in favor of P&F on its common count against Willis for services rendered and against Cross-defendants on Willis's cross-claims for intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract, and professional negligence. The trial court entered judgment on the special verdicts.

On appeal, Cross-defendants challenge the judgment's award against them and raise 25 contentions in a span of about 40 pages of their appellants' brief. As we explain below, Cross-defendants have waived or forfeited most of their contentions for failure to properly state the material facts, failure to make substantive legal arguments, failure to show prejudicial error, and/or other reasons and therefore we need not, and in general will not, address the merits of those contentions. As to the remaining contentions, we conclude Cross-defendants have not met their burden on appeal to show there was any prejudicial error requiring reversal of the judgment against them.

FACTUAL AND PROCEDURAL BACKGROUND[1]

In the 1950's, William McClain (William) and Teresa McClain (Teresa) married and later had two children, Billena Willis (Billena) and Carol Holland (Carol). Billena had three children: Jerne, McCall, and Willis.

---

[1] Because Cross-defendants' evidentiary contentions primarily involve challenges to the sufficiency of the evidence to support the judgment, we recite the facts in the manner most favorably to the judgment and resolve all conflicts in favor of Willis. (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 387; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 553–554; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.) Conflicts in the evidence are noted only where relevant to the issues on appeal. (*Meister*, at p. 387.) *People v. Smith* (2005) 37 Cal.4th 733, 739, cited by Cross-defendants, does not support, much less require, a different approach to our statement of facts.

2

The McClains bought residential property on Oliver Avenue in the Pacific Beach neighborhood of San Diego, lived in its back house, and rented the front house to tenants. They also bought a single family residence on Mount Aladin Avenue in the Clairemont neighborhood in which their adult daughter, Billena, lived and raised her children. The McClains made the down payment for the Aladin home, while Billena made the installment payments on its mortgage.

In 2003, the McClains, as trustors and trustees, executed a revocable living trust (Trust), providing, inter alia, that Billena would act as their first successor trustee and Billena and Carol would inherit the Trust property on their deaths. In 2007, William and Carol died, leaving Teresa as the sole trustor and trustee of the Trust and Billena as its sole successor trustee and beneficiary. The Trust's property included the Oliver and Aladin properties.

In 2011, Teresa executed a first amendment to the Trust, making Billena its sole successor beneficiary and providing that, if Billena predeceased Teresa, then Willis would be its sole successor beneficiary. It also provided that if Billena were unable or unwilling to serve as the Trust's successor trustee, Willis would serve as its successor trustee. Teresa also executed a durable power of attorney, which appointed Billena as her attorney-in-fact in the event of her incapacity and, if Billena were unable or unwilling to so act, Willis would then serve as her attorney-in-fact. In 2013, Teresa executed a second amendment to the Trust, appointing Billena as a co-trustee and reaffirming the other terms of the Trust.

By early 2015, Teresa was experiencing memory problems that led Billena to move in with her, provide daily care for her, and manage much of her finances. However, Billena had been diagnosed with cancer and planned to travel to Hawaii for alternative treatment. Barbara Carson (Barbara),

3

Teresa's sister from Indiana, arrived in San Diego in late May to care for Teresa in San Diego while Billena was away.

In early June, Teresa obtained temporary restraining orders (TROs) against Billena, McCall, and Willis. Teresa thereafter retained attorney James Stoffel to represent her regarding the TROs and her trust and estate matters. Teresa also revoked her 2011 durable power of attorney.

Also, in June, Billena resigned, ostensibly, as the successor trustee of the Trust, leaving Willis to act as its successor trustee.

In or about July, Billena and Teresa met with Stoffel, Teresa's attorney. Stoffel summarized the meeting in a letter to Billena's attorney, William Freed, who was not in attendance per his election. Stoffel stated that the meeting went well and it was his advice that the two sides work together without litigation in order to help Teresa. In particular, he suggested that Freed's clients (presumably referring to Billena and Willis) voluntarily resign as trustees of the Trust and mutually agree on the appointment of an independent fiduciary who would serve as trustee of the Trust and as Teresa's proposed conservator and look out for Teresa's best interest. Stoffel stated that Teresa had made it clear to him that she did not want Billena, Willis, or McCall handling her finances or residing with her any longer. In response, Freed sent Stoffel a letter agreeing that they should create better harmony among the family members. Freed also agreed that the appointment of a professional fiduciary would help accomplish that. Freed stated he had contacted Patricia Fister, a professional fiduciary, regarding acting as conservator of Teresa's estate and expected that Linda Grunow, Fister's attorney, would file the conservatorship petition soon. Freed stated it would also make sense to have the same person (i.e., Fister) act as the Trust's successor trustee. In reply, Stoffel sent Freed a letter confirming their telephone conversations and agreement to proceed with the

4

appointment of an independent trustee of the Trust who could also act as Teresa's conservator.  He also confirmed their agreement to sign requests for dismissal of the three restraining order petitions Teresa had filed against Billena, McCall, and Willis.

In July, Barbara returned to Indiana.  In August, Teresa, apparently accompanied by a neighbor, flew to Indiana presumably to visit Barbara.

In August, Stoffel filed a petition in the probate division of the San Diego County Superior Court on behalf of Teresa, seeking an order removing Billena and Willis as the Trust's successor trustees and appointing a professional trustee to manage the Trust and its estate.  The petition requested the appointment of Fister as the successor trustee of the Trust, alleging she was "an independent professional licensed fiduciary" who would be required to preserve the assets of the Trust.

In late August, McCall spoke with Pavone regarding possible litigation as to Teresa.  On September 3, Freed sent a letter to Willis reminding her of Teresa's petition for her removal as trustee and her replacement with Fister and noting that a hearing was set for October 6 and her response was due on September 23.  Freed further informed her that if his outstanding bill for attorney fees was not paid, his representation of her would be terminated.

On September 15, Pavone sent a letter to McCall and Willis, discussing the probate court petition filed by Stoffel to remove Willis as trustee of the Trust and their desire to obtain Teresa's return to their care.  In particular, Pavone acknowledged the October 6 hearing date and emphasized that "we need a strong opposition with our own documentation and declarations" and "we would like to file a written opposition before that date [i.e., October 6]." He also discussed the option of filing a conservatorship action to declare Teresa incompetent and for Willis to be appointed as her conservator, thereby regaining control over her affairs.  In sum, Pavone proposed that he

5

"immediately prepare an opposition to the current petition and simultaneously work towards obtaining a conservatorship at the earliest possible date."

On September 17, Fister filed an ex parte petition for her appointment as temporary successor trustee of the Trust. Attached to her petition was a copy of Teresa's executed nomination of Fister as successor trustee of the Trust, dated September 17.

On September 18, Pavone, on behalf of P&F, sent an e-mail to Willis, attaching a proposed attorney-client agreement, and asked her to initial and sign it. He stated: "We'll continue the investigation and start in on the litigation filings as we've been discussing as soon as this is executed."

On September 24, Willis and Billena executed an attorney-client engagement agreement (Agreement), retaining P&F. Section 1.0 of the Agreement described the legal services to be provided to them, stating:

> "The legal services we will provide to you are as follows: Representation of you in connection with, in this order of priority: (1) to recover custody of Teresa McClain, mother to Billena and grandmother to [Willis], from the abduction by third parties and to enable as much contact is [*sic*] possible while Billena is living; (2) to protect Teresa's assets (including the family compound in Pacific Beach) from changes to its succession, as originally created and intended by the 2003 estate plan; and (3) to take other actions, directed at banks, law enforcement or third parties, as may maximize the goals as stated in (1) and (2)."

Section 2.1 of the Agreement stated: "We will perform legal services as called for under this Agreement, keep you informed of progress and developments, and respond promptly to your inquiries and communications." Section 3.0 set forth their fee agreement, stating: "This is an hourly case." Section 3.1 set forth the respective hourly rates for legal services provided by Pavone ($425

6

per hour) and Kimberly Fonner ($350 per hour), P&F's partners, and Tara Burd ($275 per hour), described as an "associate." Importantly, section 3.1 further stated:

> "Attorney has estimated that *Client could incur $100K (or conceivably more)* for the serious litigation effort that is needed to undo the circumstances in which Teresa has been physically removed to Indiana, which includes an emergency effort to establish Teresa's competency in order to regain custody and control over her; there is a pending estate action seeking to remove [Willis] as trustee that must be resisted; there may be a necessary elder abuse action to file against Barbara Carson and Christy Mundo; there is a possible bank case; much of this is expected to move on expedited time frames given Billena's health; and there is a substantial amount of real estate that is all in potential jeopardy due to the machinations of Barbara Carson, Christy Mundo and possibly others. While Barbara and Christy could fold and end the litigation easily and inexpensively, it is apparent that they are after Teresa's estate, have liquid funds to finance a fight, and are thus incentivized to wage a battle as long as they have a shot at capturing some or all of Teresa's wealth." (Italics added.)

Willis and Billena agreed to also pay the costs and expenses of their representation by the firm.

Section 6.0 of the Agreement provided that P&F would have a lien against certain property interests of Willis and Billena, stating:

> "*Client does not have liquid assets in their possession in order to pay Attorneys for the fees that will be generated for these various legal efforts.* Therefore, in order to protect against the risk of non-payment, the following forms of recourse and collateral will be granted to Attorneys:
>
> "(a) to the extent that Attorneys can seek fees under the estate documentation by filing a fee application with the

7

probate court, they will pursue that as one avenue of being compensated;

"(b) if Attorneys file damage claims and are able to recover monetary damages or their fees from third parties, they will also be entitled to seek remuneration in this manner. Attorneys will have a lien against any recovery in actions in which damages are sought.

"(c) Attorneys will record a 'charging lien' against any real property belonging to Clients. This is a filing with the San Diego County Recorder's office where Clients grant a lien against any real property that Clients have an interest in.

"(d) Clients will be personally liable for the fees generated.

"(e) If the avenues stated above are not working to result in compensation for attorney's effort in a reasonable and timely fashion, Attorneys may insist that Clients begin efforts, as are possible, to refinance any real property they have an interest in." (Italics added.)

On October 6, the probate court (Judge Julia C. Kelety) held a hearing on Fister's ex parte petition for her appointment as temporary successor trustee of the Trust in place of Willis. Stoffel appeared on behalf of Teresa, Pavone and Burd appeared on behalf of Willis, and Grunow appeared on behalf of Fister. The court granted the petition and ordered Fister to make the Trust property productive and not sell or encumber the Trust real property without a court order. Fister's appointment as temporary trustee was set to expire on January 4, 2016, unless extended by the court. In her e-mail to Pavone summarizing the hearing, Bonnie McKnight, apparently Pavone's law clerk, reported that Willis "was relieved and happy that someone [i.e., Fister, a professional fiduciary] would be able to manage the estate since opposing counsel had blocked any of her attempts to pay for the estate. [Willis] explained that she had spoken to Fister a couple of times. She believes Fister knows what's best for the estate and understands the

family's situation with Barbara and Christina. Once *Ben* [Pavone] *explained that no further changes could be made to the trust*, Dana [Billena's sister-in-law] calmed down." (Italics added.)

On October 20, Pavone, on behalf of Willis, filed a petition for appointment of temporary conservatorship, requesting that the probate court appoint Willis as Teresa's temporary conservator. The petition alleged that a conservatorship was needed to protect both Teresa and her estate from Barbara "who has abducted [Teresa] and is keeping her in Indiana under restrictive control. Even before the kidnapping, when [Barbara] arrived in San Diego in May 2015, she began to isolate [Teresa] from communicating with her other family members . . . . [Barbara] seeks to control [Teresa] and everyone's access to her so that she . . . can steal [Teresa's] considerable financial assets and other forms of wealth." In his points and authorities in support of the petition, Pavone argued that the evidence showed Teresa was incompetent, was taken to Indiana under false circumstances and by undue influence, and should be immediately returned to San Diego to be with Billena in Billena's final days. On the same date, Pavone also filed in the probate court a petition for Willis's appointment as conservator over Teresa.

On or about October 28, Pavone apparently filed a motion for reconsideration of the probate court's October 6 order appointing Fister as successor trustee of the Trust. In his declaration in support of the reconsideration motion, Pavone declared that when Fister filed her ex parte application for appointment as trustee on September 17, Willis and her family did not have counsel. He stated that his firm was substituted in as their counsel on October 2 and only learned of the October 6 hearing on the morning of the hearing. As a result, his firm did not have time to prepare or file papers to oppose the petition, but was able to appear and orally oppose it. Pavone then declared that "a completely different picture ha[d] emerged

9

based on numerous declarations filed in support of this motion and previous motions, which reveal that Teresa . . . is incompetent, the conflict was orchestrated, and she is being manipulated by a series of forces, principally by her long lost sister Barbara . . . .  These facts, which were not before [the probate court] at the time of the original motion, are new and different within the meaning of [Code of Civil Procedure, section] 1008, subdivision (a)."  In his points and authorities in support of his motion for reconsideration, Pavone argued that there was never good cause for Willis's removal as successor trustee of the Trust because Teresa had caused the failure to pay her bills by closing the bank account from which those bills were paid.

In late October, P&F sent Willis its first invoice for legal services rendered for a total amount of $107,093 (after a $1,000 deduction from her $2,000 deposit for costs incurred).  The invoice reflected that Pavone began his review of the case file on September 8 and completed his review on September 10.  Thereafter, he and other attorneys continued to work on the case on a daily basis.  In his cover e-mail to Willis attaching the invoice, Pavone explained the reasons for the large amount of the invoice and the expected monthly amounts going forward.  Pavone stated:

> "It's an enormous bill, and the burn rate is too high to be sustainable—for either your family or my firm.  I'd like to cut 1/3 off of it (bringing it down to about $72K), but we need to reduce the amount of risk of non-payment on our side.  Recall, we had planned to record liens against the property as security, but before we could get that done, you got removed as trustee.  You don't have authority now to give us lien protection against any of the properties held in the trust, so P&F is hanging out in the wind unsecured.
>
> "[¶] . . . [¶]
>
> " . . . [L]et's assume it is a $20K/mo[.] burn rate to litigate. You're going to have to make some tough choices on your [litigation] priorities. . . .

10

"We will continue doing what we think is best with the expectation that the burn rate will come down to about $20K/mo[.], and otherwise adjust the litigation goals as you direct."

On November 12, Billena died, leaving Willis as the sole surviving successor beneficiary of the Trust.

On December 1, the probate court held a hearing on Willis's petition for conservatorship over Teresa. Philip Lindsley appeared as Teresa's court-appointed attorney, Pavone and Burd appeared on behalf of Willis, and Stoffel specially appeared on behalf of Barbara who had filed a motion to quash service of the petition for lack of jurisdiction. Lindsley stated that he could not take any position on the petition until he had spoken with Teresa in person. The court authorized Lindsley to travel to Indiana to meet with Teresa and then continued the matter until March 2016.

In early December 2015, Grunow, as Fister's attorney, sent an e-mail to Pavone informing him that in compliance with the probate court's order to make the Trust's property productive, Fister would be requiring Willis to pay $2,500 monthly rent for the Aladin property in which she resided, effective immediately. On learning that information, Willis informed Pavone that her wish was to be restored as the Trust's successor trustee and therefore she did not want to dispute the Trust's ownership of the Aladin property and would remain there as a renter. In a December letter to Grunow, Pavone informed her of Willis's wishes and intent to not challenge the Trust's ownership of the Aladin property, but disagreed with the $2,500 monthly rent and suggested $1,800 monthly rent for the first year and about $2,100 monthly rent thereafter.

In early December, Pavone sent Willis P&F's second invoice for legal services, reflecting additional charges of $51,194 incurred during the month of November, which when added to the first invoice resulted in a total

outstanding balance of $162,087 (after deduction of her entire $2,000 deposit). In his cover e-mail to Willis, Pavone stated: "I was relieved to come in at $160K, plus I still have discretion to apply what we call in this business 'billing judgment,' which is a fancy term for discount. . . . [¶] To nutshell it, we've spent three intense months on this, and this translates to about a $50K/mo[.] tab. This should come down substantially. The case is now stable. . . ."

Also in December, Fister sent Willis a 60-day notice to quit her tenancy of the Aladin property, citing her failure to pay rent for it. In an e-mail to Pavone, Grunow clarified that Fister's notice to quit was not a rejection of his proposal for resolution of the matter.

On January 2, 2016, Pavone sent an e-mail to Willis and her family members requesting a "Come to Jesus" meeting with them after the upcoming hearing in the probate court. He stated: "The forces we are up against are organized, experienced and serious. And while we started strong, I feel like the family's energy to fight is collapsing. [¶] . . . The family needs to rally" and stated, if it does not, "Teresa will not be returned home, ever, and the entire $2M estate will get stolen."

The following day, Pavone sent McCall an e-mail, with a copy to Willis, stating his belief regarding the underlying basis for the probate court's ruling at the October 6, 2015 hearing. Pavone stated:

> "When Judge Kelety insinuated toward me last hearing (out of the blue) that we were 'all about the money,' (which is *so* not us), I think in hindsight it was maybe an act of projection, not actual inquiry.
>
> "Since the last hearing, I have been past any idea of thinking that we need just to find the right approach with this judge. I think [Burd] is still searching for that, in vain. Our papers were _so good_, and theirs were _so bad_ (did they even file papers to oppose the conservatorship request?),

12

and it was so _not_ a close call. I've come to the opinion that this case requires a bloody, scratch-your-eyes-out war with the probate system to keep this estate from being stolen by the involved professionals.

"We've got to become the one case where there is just too much resistance to be worth it for them. As I was saying to [Willis] recently, it requires us to be kicking, screaming, fighting, appealing, suing, objecting and otherwise resisting in every way possible.

"We're working on some theories that will put Fister/Grunow in the position of having to face a jury in a damage action, preferably in regular civil court in front of another judge."

On January 4, the probate court held a case management conference hearing on Teresa's petition to remove Willis as successor trustee. The court ordered Willis to turn over to Fister various documents relating to the Trust properties and authorized Fister to rent the Aladin property for fair market rental and evict Willis, if necessary. The court then continued the matter until May 9.

In early January, Pavone sent Willis P&F's third invoice, adding $26,805 in legal fees and costs for services rendered during December 2015, for a total outstanding balance of $186,892.

Also in early January 2016, Pavone apparently gave Willis a two-page written "to-do" list setting forth his litigation strategy notes. He stated: "This is a dogfight for your inheritance. The other side is dead serious in their aim to steal it from you—all of it." Regarding his outstanding legal services bill, he stated: "We've fronted now over $180K trying to unravel what has been a conspiracy to steal your inheritance dating back at least two years, with the unfortunate topper that the conspirators not only have been playing chess in your absence, they are led by a very experienced lawyer, armed with the blessing of the probate judge and probate insiders." He

13

requested that she pay about $100,000 toward the outstanding balance of his firm's bill.

In late January, Pavone filed a complaint on behalf of Willis against Fister, alleging causes of action for breach of contract, wrongful eviction, declaratory relief, and injunctive relief. The complaint alleged that Billena and her children, including Willis, moved from Hawaii and into the Aladin property in reliance on William's and Teresa's promise, as trustees of the Trust, that they could live there rent-free as long as Billena paid the mortgage, taxes, and other related bills and, once the mortgage was paid in full, they would be able to live there without paying rent.

On January 29, the probate court issued a minute order denying Willis's motion for reconsideration of its October 6, 2015 order. The court stated that Willis's asserted new evidence could, with reasonable diligence, have been presented at that prior hearing.

On February 8, 2016, the civil division of the San Diego County Superior Court (Judge John S. Meyer) issued a minute order, granting Willis's ex parte request for a temporary restraining order precluding Fister from evicting Willis from the Aladin property on the condition that she start paying $2,500 per month rent, commencing that month (February).

In early February, Barbara filed a petition in the Hancock County, Indiana superior court seeking an order finding Teresa to be incapacitated and appointing Scout Guardianship Services, Inc. (Scout) as guardian of Teresa's person and estate. The petition alleged that Teresa was residing at a care facility in Greenfield, Indiana, and suffering from dementia consistent with Alzheimer's disease. It also noted that Willis had filed a petition in the San Diego County Superior Court to be appointed as conservator of Teresa's person and estate. Attached to the petition was a copy of a report by

14

Dr. John Chase, who had examined Teresa and concluded she suffered from severe dementia and/or Alzheimer's disease.

On February 16, the Indiana court appointed Scout as temporary guardian of Teresa's person and estate.

In late February, Pavone sent Willis an e-mail, stating that he had not yet received the Indiana guardianship papers, but he had heard about the petition. He then commented on the proceedings in the San Diego probate court to date, stating: "I'm accustomed to intense legal battles, but rarely is it a tense battle conjoined with a judge who blindly favors the other side, much less without any apparent political reason . . . . We're still scratching our heads wondering what would so motivate a judge to intentionally violate the law (on the motion for reconsideration ruling). That's a powerfully motivated judge against us; but why? Is she blinded by deference to the trustee? Too lazy to rule conscientiously? Getting information we're not privy to? A crook motivated by a promised back end cut of your equity? Conducting some sort of trial-by-fire exercise for our growth? What is going on in this judge's head?"

On February 26, the probate court (Judge Robert Longstreth) issued a minute order denying Teresa's motion to quash service of Willis's petition to appoint a conservator for Teresa.

In early March, Lindsley, as Teresa's court-appointed attorney, filed a report with the San Diego probate court regarding his visit with Teresa in Indiana. Based on his observations of her, Lindsley described Teresa as "profoundly confused" and noted that "[m]uch of what she says is 'word salad' with no discernable message." She told him she wanted to "go home," which she identified as San Diego. Lindsley stated: "Unless there had been a very rapid deterioration since [Teresa] arrived in Indiana, I could not imagine the person I met forming the intent and ability to make that trip [from San Diego

15

to Indiana] herself." Lindsley concluded that he believed Teresa was "wholly and completely unable to maintain a normal attorney-client relationship." He further informed the probate court that he would not oppose Willis's petition for appointment of a conservator for Teresa's person. However, he opposed Willis's request for appointment of a conservator for Teresa's estate. He also supported Teresa's return to San Diego.

On March 7, the probate court (Judge Kelety) issued a minute order granting Willis's petition for her appointment as temporary conservator of Teresa's person, but denying, without prejudice, her request to be appointed as temporary conservator of Teresa's estate. The court also issued an order continuing the hearing on Willis's petition for appointment as conservator of Teresa's person and estate. On March 11, the court issued letters of temporary conservatorship appointing Willis as conservator of Teresa's person and authorizing her to have Teresa complete a neurological psychological examination to determine the feasibility of her safe return to San Diego.

In mid-March, Barbara filed a petition in the Indiana superior court seeking a preliminary injunction preventing Teresa's removal from her current care facility for a neurological psychological examination. The petition alleged that Teresa might not be returned to her care facility, but instead be transported to California.

In late March, Pavone, on behalf of Willis as Teresa's temporary conservator, filed an ex parte petition in the San Diego probate court, requesting an order authorizing Teresa's immediate return to San Diego. The petition alleged that Teresa had completed a neurological psychological examination and the neurologist cleared her to return to San Diego. However, on March 24, the Indiana superior court issued a preliminary

16

injunction preventing Teresa's removal from her care facility pending its further order.

In his March status report filed in the San Diego probate court on behalf of Scout (Teresa's temporary Indiana court-appointed guardian), Stoffel stated that he did not oppose Teresa's move to California. Stoffel further stated: "If the California court orders Teresa to be moved to California, I will take steps to inform the Hancock County Superior Court of the California Court's preference."

On March 25, the San Diego probate court issued an order granting Willis's ex parte application authorizing Willis to return Teresa to San Diego County, provided that the Indiana superior court vacate its preliminary injunction.

In mid-April, Pavone, on behalf of Willis, filed a motion to dismiss the Indiana guardianship petition filed for Teresa for lack of jurisdiction under the Uniform Adult Guardianship Protective Proceedings Jurisdiction Act (UAGPPJA). The motion argued Teresa's home state was California and that conservatorship proceedings for Teresa were ongoing in California.

Also in mid-April, Pavone filed a petition for writ of prohibition on behalf of Willis, challenging the probate court's order appointing Fister as successor trustee of the Trust on the basis that Teresa was incompetent when Stoffel filed the original petition for appointment of a successor trustee.

On April 18, 2016, the Indiana superior court conducted a trial on Barbara's petition to have a guardian appointed for Teresa. Willis appeared at the trial, represented by Ashley Dyer, her Indiana attorney, and by Pavone and Burd. The court gave each side one hour to present their case. After hearing testimony from various witnesses and admitting documentary evidence, the court took the matter of its jurisdiction under submission

17

pending receipt from counsel of their closing arguments and proposed findings of fact and conclusions of law.

In late April, Pavone filed a 42 U.S.C. section 1983 complaint in federal district court on behalf of Willis against Michael M. Roddy, as the Clerk of the San Diego County Superior Court, Stoffel, Fister, and Teresa for violation of Willis's 14th Amendment right to due process. The complaint explained its purpose at the outset, stating: "This case is filed to halt a pending state court lawsuit, McClain v. Willis [i.e., Teresa's petition in the San Diego probate court to appoint a successor trustee of the Trust]. There is no jurisdiction for the San Diego [County] Superior Court to act in this matter. [Teresa] was incompetent at the time of the August 18, 2015 filing and had been so for about a year. Her attorney, James Stoffel knew this. . . . There is no jurisdiction for any of this. An incompetent client cannot be represented by a private attorney. A private attorney cannot file a lawsuit adjudicating [*sic*] such a client's rights."

Also in late April, Pavone filed points and authorities in support of a motion to dismiss Teresa's petition for appointment of a successor trustee on the ground the probate court lacked jurisdiction because Stoffel knew Teresa was incompetent at the time the petition was filed.

In early May, Pavone filed a memorandum of points and authorities in the federal district court on behalf of Willis in support of her "emergency motion" that sought a preliminary injunction enjoining the San Diego probate court proceedings based on its alleged lack of jurisdiction.

On May 9, the San Diego probate court held a hearing on, and granted, Teresa's petition and issued a minute order removing Willis as successor trustee of the Trust and appointing Fister as trustee of the Trust. In support of its order, the court cited, in particular, Willis's "unresolvable conflict"

18

based on her claim of an interest in the Aladin property that was adverse to the Trust.

On May 17, the San Diego probate court issued letters of temporary conservatorship appointing Willis as conservator of Teresa's person. The court specifically authorized Willis to return Teresa to San Diego County provided that the Indiana superior court vacated its preliminary injunction.

On May 24, the San Diego probate court held a hearing at which Fister sought approval for her to either sell or mortgage Trust property to provide sufficient funds for Teresa's care and the costs of managing and maintaining Trust property, including Fister's fees and expenses. Pavone argued that Willis preferred an option proposed by Fister involving a $536,000 five-year loan encumbering the Oliver property. The court accepted that option and authorized Fister to mortgage the Oliver property. In the course of discussing an accounting by Fister as trustee, the court delivered a cautionary message to Pavone:

> "I'm sorry your client [Willis] isn't here today for me to tell her—she is the ultimate beneficiary of this Trust. If she survives [Teresa], which one might think she would, that she would. And, so she's perfectly free to litigate all of this and this has been intensely litigated, and but I think and I hope that she has in mind that at the end of the day, if [Teresa] dies leaving, leaving an estate, leaving a Trust, [Willis] will look back and realize that she just spent all of her money, her own money on this litigation. She's going to be paying *your* fees, and she will have paid the fees of everybody else, unless and until there's some finding of malfeasances or something else which I haven't seen yet. But, you know, keep an open mind to see what the future holds. So, I would think that it's certainly her right and her prerogative to drill down into all of this and understand everything and do full blown scorched-earth litigation. I just think that, this is not a civil case where there's a magic insurance policy in the sky that will rain down money on

19

everybody.  That's not happening.  Every penny we're
spending, every penny Ms. Fister has to spend to respond
to discovery, to appear in court, ultimately, again if
[Teresa] leaves an estate when she passes, will have been
paid by [Willis].  So, that's where we are."

On May 27, the Indiana superior court issued its judgment on
Barbara's petition requesting that a guardian be appointed for Teresa.  The
court made extensive findings of fact, including a finding that "Teresa made
the decision to come to Indiana for a visit with Barbara . . ." and "after
requesting and receiving the assistance of Mr. and Mrs. Raymond Byrnes to
book a flight from San Diego to Indianapolis, Indiana, Teresa made the trip
on August 7, 2015 and called Barbara from the Indianapolis International
Airport and asked Barbara to come and get her."  The court further found
that after Teresa learned the following day that Billena and Willis had moved
into her Oliver Avenue home, changed the locks, and removed Teresa's
personal property, Teresa told Barbara that she "might as well stay in
Indiana.  I don't have a home to go back to."  The court also found that Willis
"did not introduce any evidence tending to prove that Teresa was legally
incompetent to make a new choice of residence at any time prior to the
examination by Dr. John Chase on September 25, 2015 in Greenfield,
Indiana."  It further found that Teresa initially resided with Barbara, but fell
on several occasions and left for a walk without telling Barbara.  Thereafter,
Teresa moved to an assisted living facility in Greenfield and, after that
facility was closed by public authorities, she moved to another facility in
Greenfield.

The court then concluded Willis had not submitted any evidence
showing Teresa had been kidnapped by Barbara and brought to Indiana
against her will.  To the contrary, it found "the preponderance of the evidence

20

established that Teresa left her former home in San Diego on her own and without pressure from anyone." The court found that after August 7, 2015, Teresa was a resident of Indiana and remained a resident of Indiana on the date of its judgment. It further found that on August 11, 2015, Teresa was competent to choose a new residence and on that date chose to remain in Indiana permanently. The court further concluded it had jurisdiction over the guardianship petition filed on February 16, 2016, by Barbara for Teresa because Teresa had been a resident of Indiana for six months at that time, thereby making Indiana her "home state" for purposes of the UAGPPJA. Nevertheless, the court found that California was the more appropriate forum under the UAGPPJA because, inter alia, Teresa "has had minimal contact with Indiana and substantial history as a resident of California" and "[Teresa's] real property which is in her trust is all located in California as are her family doctors and personal records and history." The court also noted that although Teresa had expressed a desire to stay in Indiana, "she may have been incompetent when she made that statement."

The court found it had jurisdiction over Teresa. Although Indiana was or could have been considered Teresa's home state, the court nevertheless declined to exercise its jurisdiction over her. Accordingly, the court ordered that the guardianship petition for Teresa was to be stayed, pending further action by the San Diego probate court in order to ensure her care and well-being. The court further ordered that Teresa could be moved to a new facility that was better equipped to meet her needs, as found by the San Diego probate court, and that such move order was to be filed with it.

On June 2, Teresa returned to California and moved into a residential care facility in San Diego County. On June 21, Teresa passed away.

In late June, Pavone filed a declaration in the San Diego probate court, stating in part:

"1.  This Court has ***again*** failed to read the papers before levying a bunch of foolish and biased remarks against [Willis].  This has been going on since the inception of the case, almost exclusively to [Willis's] detriment, because this Court does not read the papers.  Indeed, this Court has a history of perceived incompetence based on failing to read the papers filed by parties appearing before it.

"2.  On June 21, 2016, Teresa McClain passed away after having been kidnapped to Indiana by her sister and not timely returned because of this Court's decision to basically ignore emergency conservatorship papers filed in October, 2015.  Instead, it bought the false narrative of a wholly corrupt attorney, James Stoffel, who was cleverly impersonating Teresa's wishes in court filings."

Pavone continued, extending his criticism to the Indiana court, stating:

"11.  . . . The Indiana decision is a political ruling that returned Teresa to [Willis's] custody in California, despite making factual findings in favor of Barbara Carson across the board.  Why would a court find the facts in favor of one party across the board and then rule for the other [party]?  It does not take a rocket scientist to understand the politics of the situation.  The Indiana Court's factual findings act as insulation against liability for a myriad of torts, crimes and professional wrongs committed in this case, against the Willis family, including by persons in Indiana.  Put another way, what has happened in this case is *so bad* that the courts, including this Court, have to make protectionist rulings to whitewash the misconduct, mistakes and misjudgments so as to insulate the players from exposure to civil liability, mistakes that in a real way have now resulted in the settlor's early death.

"12.  It is amateurish for this Court to misunderstand these politics by concluding that the Indiana[] [court's] factual findings are in any way reflective of the truth. . . .

"13.  . . . Teresa McClain was never competent, everybody knows it, and these proceedings are—and always have been—a farce.

22

"14. Put simply, it is not clear how this Court, and the avarice of probate professionals that feed off its cronyism, could have bungled this case any more than it did, at the continuous, tragic and permanent expense of this innocent family."

In late September, a settlement agreement and mutual release was executed by and among Fister, Willis, Grunow (Fister's former counsel), Debra Streeter (Fister's then current counsel), Stephen C. Hinze (Fister's eviction counsel), and Pavone. That agreement settled their disputes regarding the funding and administration of the Trust, the distribution of Trust property, and other Trust issues and, in particular, authorized Fister to pay $125,000 out of Trust funds for her trustee fees and related attorney fees. It also provided that the pending appeal would be stayed until the Trust's assets were distributed and thereafter dismissed with prejudice.

Also in late September, Pavone sent Willis an e-mail discussing various litigation options and attaching P&F's fourth invoice. In that e-mail, Pavone stated, inter alia, that although their working theory had been to appeal the probate court's judgment and vindicate what had happened, it was now his "marginal judgment to cap" her exposure by settling with the other parties and not appeal. In that context, Pavone commented: "Honestly, I don't trust the Court of Appeal to render a decision that strictly follows the law. I've seen them superimpose their world view over it."

P&F's 44-page fourth invoice, dated September 20, 2016, restated the outstanding balance of $186,892 from its prior three invoices from October 2015 through December 2015, added its new fees totaling $432,407 that were incurred during the eight and one-half month period from January 2016 through September 20, 2016, reduced the $619,299 total amount by $50,000 for mooted appellate work and $14,800 paid by the Willis family, and added $24,684 in costs, for a net balance due of $578,415.

On September 20, Fister, as ordered by the probate court on July 22, signed a quitclaim deed, as the Trust's successor trustee, transferring the Aladin property to Willis and subsequently recorded that quitclaim deed. Willis thereafter obtained a $235,000 mortgage loan on the Aladin property and $186,892 of the loan proceeds were distributed to P&F at the close of escrow. Thereafter, Pavone apparently paid Willis $28,300 of that amount so that she could reimburse various Willis family members for their contributions toward the litigation related to Teresa and the Trust.

In November, Fister, as successor trustee of the Trust, executed a $550,000 promissory note with a three-year term, which was secured by a recorded deed of trust on the Oliver property.

In December, Fister, as successor trustee of the Trust, executed a quitclaim deed transferring the Oliver property to Willis and subsequently recorded that quitclaim deed.

On December 31, P&F sent Willis its fifth invoice, reflecting the prior outstanding balance, new fees and costs of $30,686 incurred during the period from September 21 through December 31, and deducting Willis's payments of $158,592, for a net total amount due of $451,109.

On January 3, 2017, Willis entered into a listing agreement with a real estate broker to sell the Oliver property. On or about January 15, Willis entered into an agreement to sell the Oliver property for $1,200,000.

In late January, Pavone sent Willis an e-mail informing her of the San Diego probate court's January 20 order granting Stoffel's request for an award of attorney fees. In particular, Pavone stated that the probate court's ruling "spews a lot of crazy in there. . . . There must be a dozen errors." Regarding a possible appeal of the order, Pavone stated: "[T]he challenge is that we'd probably be making our case on appeal to more judges who do not view the world as we do."

24

Also in late January, Pavone sent Willis an e-mail attaching P&F's sixth invoice, adding new fees and costs of $1,882, for a new balance due of $452,991. In his e-mail, Pavone also discussed further a possible appeal of the probate court's January 20 order. In particular, Pavone stated:

> "It would cost about $50K to appeal (since I've already done about that much appellate work in this case and the way the facts are written in the existing motion papers are already appellate quality) to take that shot at opening the door to the jury system, where there is a better chance of justice and accountability.

> "Over time, I've concluded that the Fourth District Court of Appeal is usually hostile to individual rights. We saw this disregard of our position reflected by its rejection of our Writ, which largely raised the same issue about Teresa's competence. So I would peg the chances of victory on appeal at 15-20%."

In mid-February, Pavone sent Willis a letter, stating that he was interpreting her lack of a response to his request for a decision whether she wanted to appeal the probate court's January 20 order as her decision not to pursue an appeal. Pavone then stated: "Accordingly, this letter respectfully serves to mark the end of our representation on all cases."

On or about February 27, escrow closed on Willis's sale of the Oliver property. Pursuant to amended escrow instructions, Willis directed that the escrow company distribute the sale proceeds evenly between Jerne and McCall. On February 28, the escrow company issued two checks to each of Jerne and McCall in the amounts of $195,743.92 and $97,814.31, resulting in distribution of $293,558.23 to Jerne and McCall.

On February 28, Pavone sent Willis P&F's seventh invoice, reflecting the prior outstanding balance, reversing a prior discount of $51,331, and adding $3,039 in interest, for a total outstanding balance of $507,361.

25

On March 1, Pavone sent Willis a letter noting that she had apparently sold the Oliver property and asserting he had a lien against the sale proceeds, as well against $137,000 in cash she received in December 2016.

*Instant action.*

On or about March 1, LOBP filed a complaint against Willis and Doe defendants, alleging causes of action for breach of contract and quantum meruit and a common count for services rendered and seeking $507,361 in unpaid legal fees and costs and other relief. The trial court subsequently granted LOBP's ex parte application for, and issued, a temporary restraining order enjoining Willis from disposing of any personal assets, including any assets from the sale of the Oliver property. The court later granted LOBP's unopposed motion and issued a preliminary injunction enjoining Willis from disposing of any personal assets, including any assets from the sale of the Oliver property.

On July 13, Firms filed an 85-page first amended complaint (FAC) against Willis, McCall, Jerne, and Doe defendants, alleging causes of action for: (1) theft; (2) receiving stolen property; (3) aiding a Penal Code section 496 offense; (4) conversion; (5) fraudulent concealment; (6) breach of contract; (7) quantum meruit; (8) common count for services rendered; (9) conspiracy to violate Penal Code section 496; and (10) conspiracy to commit conversion.

On or about October 16, Willis, represented by attorney Jeffrey B. Bohrer, filed a cross-complaint against Cross-defendants and other defendants, alleging causes of action for: (1) breach of written contract; (2) breach of implied contract; (3) breach of fiduciary duty; (4) professional negligence; (5) conversion; (6) embezzlement; (7) monies had and received; (8) rescission of contract; (9) fraud; (10) declaratory relief; (11) constructive trust and accounting; (12) aiding and abetting breach of fiduciary duties; and (13) assumpsit/disgorgement. Cross-defendants demurred to the cross-complaint.

26

The court issued a tentative ruling indicating that it would overrule the demurrer in part, sustain it in part, and strike three of the cross-claims (i.e., causes of action for embezzlement, rescission, and monies had and received).[2]

In April 2018, the court issued an order granting Bohrer's motion to be relieved as counsel for Willis.

After Firms filed a motion for summary judgment or, in the alternative, summary adjudication, the court issued an order denying that motion.

In October, a jury was selected for a trial on the FAC and cross-complaint. At trial, Pavone represented Firms on the FAC and Cross-defendants on the cross-complaint. Willis, Jerne, and McCall represented themselves. After jury selection, the parties presented their opening statements and Pavone began presenting witness testimony and other evidence in the Firms' case-in-chief.

In the Firms' case-in-chief, Burd testified on cross-examination by Jerne that after the probate court appointed Fister as the successor trustee of the Trust, "[n]o one would have had authority [to remove Willis as the beneficiary of the Trust] absent court order." She testified that "none of the opponents could change the beneficiary . . . [a]bsent a court order." Burd testified she had discussed with Pavone that the beneficiary of the Trust could not thereafter be changed. On cross-examination by Willis, Burd testified that the probate court removed Willis as the successor trustee on October 6, 2015 and thereafter "[i]t was very unlikely you [Willis] would lose . . . your title as beneficiary based on the evidence that we had before us at that time."

---

2  Although the appellants' appendix does not contain a court order adopting that tentative ruling, for purposes of this appeal we presume the court issued such an order.

27

Pavone testified that his firm had received about $173,000 toward its bill. Regarding a possible appeal in the probate case, Pavone testified: "I'm versed in this skill [i.e., appellate work]. I have litigated dozens of appeals . . . ." Pavone admitted that at the time of the Agreement, he knew Teresa was already in Indiana. On cross-examination by Jerne, Pavone admitted that his fees in March 2016 were $71,000 and in April 2016 were $164,000, but he did not send Willis any bills at that time because he "was consumed with the trial and everything." Pavone testified that for the $650,000 amount of his fees, he obtained Teresa's return to California "against long odds" and Willis's estate "was not stolen . . . and you got the bulk of it." However, Pavone admitted he never got Willis restored as successor trustee of the Trust and was not involved in helping Willis inherit the Trust property. He further admitted that there was greater debt against the Trust's assets after his representation of Willis than before his representation began.

On cross-examination by Willis, Pavone admitted that her opponents were paid $190,000 out of the Trust assets and his firm billed her $675,000, resulting in total litigation costs of $865,000. Pavone further admitted that it was a "significant development" for an attorney fees bill to go from $100,000 to over $650,000. Pavone read for the jury Business and Professions Code section 6068, subdivision (m), which states that attorneys have a duty to "keep clients reasonably informed of significant developments in matters with regard to which the attorney had agreed to provide legal services." Pavone admitted he had a "special protocol" with Willis that required him to call her (rather than merely e-mailing her) if there was "something that is important." He admitted he did not follow that protocol regarding the bills he sent to her, explaining that he did not feel a bill over $500,000 was that important or needed her attention.

28

Pavone admitted that he told Willis there was a risk of her "los[ing] everything if [she] didn't listen to [him]." Pavone testified that to "familiarize her," he gave her a book regarding guardianship with the phrase "How Judges and Lawyers Steal Your Money" in its title. He may have told Willis the probate court judge "was adverse to [their] interests." Pavone admitted that it was "more or less correct" that he led her to believe the entire time of his representation that "they [i.e., her opponents] could and were going to steal the estate." He testified that after he began representing Willis, he soon realized he not only had opponents, but was also "up against the [probate] system." He gave Willis a chart describing the probate court judge as "worrisome" and "difficult." Pavone admitted sending Willis an e-mail in which he presented his advice on strategy and stated that if they did not follow his advice, "Teresa will not be returned home, ever, and the entire $2 million estate will . . . get stolen." Yet, he conceded that within a few weeks after he was retained by Willis, it was unlikely the Trust could be changed. He also admitted that during his entire representation of Willis he had not seen any paperwork to remove Willis as the Trust's beneficiary. He further admitted that regardless of Barbara's intentions, she had no power to sell any of the Trust's properties after Fister was appointed the successor trustee of the Trust on October 6, 2015.

Pavone admitted that he had not successfully litigated against any of Willis's opponents, despite his discussions with her about doing so. He also testified: "I am . . . an experienced appellate lawyer."

On redirect examination, Pavone testified that he was "busy" from January through April 2016 and that "doing bills at the time was just not practical." He further explained that he did not send Willis a bill after their May 2016 "victory" because he had to catch up on other cases, knew it would

be "a big bill," was dreading sending it, and knew she could not pay it anyway and therefore he delayed sending the bill to her.

On recross-examination by Willis, Pavone admitted that he had led her to believe for over a year that the probate court judge and other professionals were stealing the Trust's estate and that she was in a dogfight for her inheritance. Pavone admitted that he never told her it was possible she would be paying the costs of both sides for the Trust to, in effect, litigate with itself and that those costs would amount to almost $1,000,000.

Stoffel testified that he believed Teresa was competent in June 2015 when he first began representing her. He considered Barbara to be a caring and concerned sister to Teresa. He filed the probate court petition for appointment of a professional successor trustee for the Trust to ensure that the court would assume jurisdiction over, and supervise, the Trust until Teresa's death. The goal of that petition was to remove Willis as trustee of the Trust, but not to remove her as the beneficiary of the Trust. Stoffel testified: "There was never any attempt to remove [Willis] as a beneficiary" of the Trust. Furthermore, he testified there was never any paperwork initiated to change the beneficiary of the Trust. After a professional successor trustee was appointed by the probate court, he was not asked to look into changing the beneficiary of the Trust and, in any event, both Teresa and the probate court would have had to agree to such a change. He testified that he was unaware of any attempts by Barbara to change the beneficiaries of the Trust while she was in San Diego. Teresa told him that she did not care who got her money after she died. Teresa told him she just wanted to make sure there was some money to take care of her while she was still alive. It was Stoffel's understanding that after a court assumes jurisdiction over and supervises a trust, no changes can be made to that trust's beneficiaries without a court order. Therefore, he believed that after the probate court's

30

October 6, 2015 order appointing a private fiduciary as the Trust's successor trustee, Teresa would not have been able to change the Trust's beneficiaries on her own. He testified that he was trying to protect Teresa's estate.

Stoffel further testified that the federal court action filed by Pavone against the probate court judge was "ill-advised and incompetent." He testified that Pavone "should have done his homework and realized the federal court has absolutely no jurisdiction over probate matters. It's a specific exclusion." He also testified that Pavone should not have filed his voluminous writ petition with the Fourth District Court of Appeal challenging the probate court's finding that it had jurisdiction over the Trust because the petition had no chance of success.

Stoffel testified that Pavone's litigation for Willis should have stopped after he took the position that the Aladin property was her property, thereby creating a conflict of interest with the Trust and disqualifying her from being a fiduciary (i.e., trustee) for the Trust. At that point, according to Stoffel, Willis should have focused on obtaining a conservatorship over Teresa.

Pavone also called Jerne, McCall, and Willis to testify, questioned them as adverse witnesses, and offered a number of exhibits that were admitted in evidence. He then concluded his case-in-chief, subject to calling two additional witnesses and admission of additional exhibits.

In their cases-in-chief, Jerne, Willis, and McCall each testified for themselves and offered exhibits that were admitted in evidence. Willis testified that Teresa and Billena had made it clear that they wanted Teresa's estate to be divided equally among the three grandchildren (i.e., Jerne, Willis, and McCall). Willis testified that before Pavone's involvement she did not want any more responsibility and therefore she found Fister, a professional fiduciary who could act as the successor trustee for the Trust.

31

However, after Teresa left to visit Barbara, Billena, who was very ill, wanted her mother back.

Wanting Teresa back home and not knowing Barbara's intentions regarding Teresa's property, Billena and Willis met with Pavone for legal advice. At their first meeting with Pavone, he told them that there was no way they could agree to a professional fiduciary for the Trust because they would steal everything for themselves and, even if they did not change the beneficiary, would drain the estate. Pavone advised Willis that she could not agree to be removed as successor trustee of the Trust and must fight it. They discussed the upcoming probate court hearing on the petition to remove Willis as successor trustee that was scheduled for October 6, 2015. However, contrary to her understanding, Pavone did not file any paperwork opposing the petition. As a result, Willis was removed as successor trustee and Fister was appointed by the probate court as trustee of the Trust.

Afterward, Pavone told Willis she was removed as trustee not because of his failure to file opposition papers, but instead because the probate court judge was friends with Grunow (Fister's attorney) and that the judge was in a conspiracy to aid her friend. Willis testified that Pavone told her the probate court judge was against her and that the probate court was corrupt. Pavone told her that the judge and her opponents were in a conspiracy to steal her entire estate. Willis testified that she and her family believed Pavone when he told them that the judge was in a conspiracy with Stoffel, Grunow, and others to steal Teresa's entire $2 million estate.

Willis relied entirely on Pavone's advice and trusted that he would do what was in her family's best interest. Willis referred to e-mails from Pavone (Exhibit Nos. A3, F, & V) in which he explained how her opponents would be made to pay for his bills because he would obtain a multimillion dollar judgment against Stoffel and others for their illegal acts. Although litigation

32

against her opponents was listed as one objective in the Agreement, he never filed any lawsuits against her opponents.

Willis also testified that Pavone led her to believe the Trust's beneficiaries could be changed even though the court had appointed Fister as a professional trustee for the Trust. However, in an e-mail dated October 7, 2015 (Exh. No. 535), Pavone told his law clerk the Trust could not be changed.

Willis also testified regarding the "special protocol" she had with Pavone, which required him to call her if there was something important that she needed to see or respond to. However, Pavone never talked to her about sending her his bill.

Willis testified that Pavone instructed her to not pay rent on the Aladin property and to oppose her eviction so that the Aladin property would not be sold. Pavone never told her that the probate court order appointing Fister as the Trust's trustee precluded a sale of the Aladin property without a further court order. He did not inform her that her challenge of the Trust's ownership of the Aladin property would preclude her from being reinstated as trustee of the Trust, and he nevertheless continued to bill her for work done to reinstate her as trustee. Although Teresa ultimately was returned to San Diego after the Indiana court's order, Teresa fell and broke her hip at her nursing home shortly thereafter and passed away a few days later.

Willis testified that she believed she had fulfilled her obligations under the Agreement by paying 180 percent of the $100,000 amount listed in the agreement, even though Pavone did not fulfill all of his obligations under it. By February 2017, she caught on that it was Pavone who "was really the one after the estate" and trying to get the Trust assets for himself. She testified that Pavone wanted to keep fighting (i.e., litigating) even though two weeks after she retained him, there was nothing further to fight. Willis testified

that Pavone led her to believe that more than nine sophisticated opponents, including judges, lawyers, and professional fiduciaries, were in a conspiracy to steal Teresa's estate, but in the end she "could see clearly it was Mr. Pavone who was trying to take the estate for himself." Furthermore, Willis testified that if Pavone had informed her that challenging the Trust's ownership of the Aladin property would have forever precluded her from being reinstated as its trustee, she never would have agreed to challenging its ownership and, as a result, would not have incurred an additional $500,000 in attorney fees thereafter.

Willis testified that she did not at any time want to challenge Fister's appointment as the Trust's trustee. Rather, it was only after Pavone told her Fister would steal everything and drain the estate that she opposed Fister's appointment as trustee.

After the evidentiary portion of the trial was completed, McCall moved for a nonsuit, arguing Pavone had not made a prima facie case on any of the causes of action alleged against her. Jerne apparently joined in her nonsuit motion. Noting, inter alia, that Jerne and McCall testified that they had no knowledge of P&F's lien before they received proceeds from the sale of the Oliver property and Pavone did not present any affirmative evidence showing they had knowledge of its lien, the court granted their motion for nonsuit and dismissed them as defendants.

Thereafter, the court read its instructions to the jury and Pavone and Willis gave their closing arguments. After deliberating, the jury returned special verdicts on the remaining causes of action. On the FAC, the jury found against Firms on their causes of action against Willis for conversion, breach of contract, and fraudulent concealment. The jury found in favor of P&F on its common count for services rendered and awarded it $284,000 in

34

damages against Willis for the reasonable value of the services it provided for which it had not yet been paid.

On the cross-complaint, the jury found against Willis on her causes of action against Cross-defendants for concealment (fraud) and false promise (fraud). The jury found in favor of Willis on her causes of action for: (1) intentional misrepresentation (fraud), awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (2) negligent misrepresentation, awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (3) breach of fiduciary duty, awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (4) breach of contract, awarding her $40,000 in economic damages; and (5) professional negligence, awarding her $47,000 in economic damages and $20,000 in noneconomic damages.

On January 25, 2019, the court entered judgment on the special verdicts in favor of P&F on its FAC against Willis in the amount of $284,000 and in favor of Willis on her cross-complaint against Cross-defendants in the amount of $287,000. The court subsequently denied Cross-defendants' motions for judgment notwithstanding the verdict, new trial, and prejudgment interest.

Cross-defendants timely filed notices of appeal challenging the judgment against them. Cross-defendants filed an 84-page appellants' brief raising 25 contentions on appeal and an appellants' appendix consisting of 8,974 pages of pleadings, exhibits, and other documents. The reporter's transcript contains 1,701 pages. Willis did not file a respondent's brief.

DISCUSSION

I

*Cross-defendants' Waiver or Forfeiture of*
*Insufficiency of the Evidence Contentions*

In Arguments 1, 2, 3, 4, 5, 6, and 7 of their appellants' brief, Cross-defendants contend there is insufficient evidence to support the verdicts against them on the cross-complaint's causes of action for intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract, and professional negligence. However, because their appellants' brief does not fairly state the material evidence in this case, we conclude they have waived or forfeited those insufficiency of the evidence contentions.

A

*Applicable law.* When an appellant contends there is insufficient evidence to support a finding of fact, we apply the substantial evidence standard of review. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) Under that standard of review, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807, italics omitted.) In so doing, we accept all evidence that supports the judgment, disregard contrary evidence, and draw all reasonable inferences to uphold the judgment. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) "[I]t is not our role to reweigh evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." (*Ibid.*)

36

In every appeal, the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; *Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1658 (*Boeken*).) "Further, the burden to provide a fair summary of the evidence 'grows with the complexity of the record. [Citation.]' " (*Boeken*, at p. 1658, citing *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) To meet its burden on appeal to show a finding of fact is not supported by substantial evidence, appellants cannot recite only evidence in their favor, but must " 'set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed to be waived.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; see also, Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶8:70, p. 8–35.)

"When appellant's opening brief states only the favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as *waived* and presume the record contains evidence to sustain every finding of fact. [Citations.]" (Eisenberg et al., *supra*, at ¶8:71, p. 8–36.) Stated in terms of forfeiture, "[w]here . . . an opening brief fails to recite and discuss the record that supports the challenged . . . decision, the appellant is deemed to have forfeited the substantial evidence argument. [Citation.]" (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1072; see also *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 [appellant waived substantial evidence challenge because "his opening brief set forth only his version of the evidence, omitting any reference to conflicting evidence submitted by [the respondent]"].)

"As with all substantial evidence challenges, an appellant challenging [a finding of fact] must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 (*Defend the Bay*).)

B

*Analysis.* Our review of the statement of facts in the appellants' brief filed by Cross-defendants shows that they consistently cited facts and evidence in their favor and omitted material evidence favorable to Willis that supported the judgment. Importantly, Cross-defendants' statement of facts includes an extensive, "one-sided" discussion of evidence supporting their theory that Barbara, Christine Mundavuozzo (Teresa's neighbor), Ray and Mari Byrnes (Teresa's tenants), Stoffel, Grunow, and Fister "form[ed] an alliance" to steal Teresa's estate and/or change the beneficiary of the Trust (i.e., remove Willis as its beneficiary), which discussion, on its face, is an argument more appropriately addressed to a trier of fact than to an appellate court. In particular, Cross-defendants assert in their statement of facts:

> "In early 2015, [Mundavuozzo] and [Barbara] involved Attorney James Stoffel. [Citation.] Over that summer, they dismantled key parts of Teresa's estate plan [citations], separated Teresa from Billena and [Willis] using the TRO process [citations], moved her to Indiana [citation], and then seized control over her estate [citations]."

They continued: "In order to accomplish such a feat [e.g., sell the Aladin property], [Barbara] would have to remove [Willis], the designated trustee [citation], and replace [Willis] with a probate professional that would, over [Willis's] objection, sell [the Aladin property] to [Barbara's] advantage. [Citations.] [¶] Attorney Stoffel needed formal legal grounds to remove

38

[Willis] [citation] and find a permissible way to deplete the estate for [Barbara's] benefit.  [Citation.]"

Cross-defendants continued their explanation of their conspiracy theory, stating:  "So, Attorney Stoffel invented grounds [to remove Willis as trustee of the Trust].  [Citation.]  On Teresa's supposed authority (she was not competent, *infra*), he forbid Teresa's creditors from doing business with [Willis].  [Citation.]  He then let Teresa's bills lapse and blamed [Willis] for the interruption of services.  [Citations.]  Simply, Attorney Stoffel *manufactured* the basis for [Willis's] removal as trustee.  [Citations.]"

After describing evidence that would support an inference that Teresa may have been incompetent from late 2014 through the middle of 2015, Cross-defendants stated:  "Given the above facts and circumstances, [Barbara], Mundavuozzo and Attorney Stoffel must have known that Teresa was incompetent to make any serious decision.  [Citations.]  Yet, Attorney Stoffel presented the trust suit [i.e., to remove Willis as successor trustee of the Trust] as if she were a competent litigant and he her private counsel. [Citations.]"  Cross-defendants continued their attack on Stoffel, their opposing counsel, stating:  "Electing to conceal the fact that he did not have proper agency authority, this monumental decision resulted in several million dollars' worth of subsequent litigation, including this attorney-client fiasco, on top of all the damage and trauma it needlessly and illegally inflicted on the Willis family."  They asserted as fact that "[b]y December 1, 2015, at the initial conservatorship hearing, everyone touching the case either personally knew that Teresa was incompetent (such as Teresa's estate lawyer, doctors, bankers, family and friends, [citations]), had a pile of undisputed affidavits establishing the fact (the probate judge, [citation]), or had been personally apprised in unmistakable terms from a medical expert's evaluation (Attorney Stoffel and his people, [citation])."

39

Cross-defendants continued to argue their conspiracy theory in their statement of facts, stating:

> "This entire litigation should have ended there. [Barbara's] bid for control over Teresa could only be legally initiated as a San Diego conservatorship action; as a regular (trust) action, it was invalid. [Citations.] Stoffel had no authority. [Citation.] Without Teresa being competent, the probate court did not possess jurisdiction over her and it therefore had no fundamental legal authority to act. [Citations.]

> "Consequently, [Willis] should have never faced a $650,000 legal bill from P&F, because the complex probate action and resulting litigation, all anchored by the trust action, were invalid from their inception. [Citations.]

> "The [Trust] provided for [Willis], *and only* [Willis], to make decisions about Teresa. [Citation.] Probate insiders and the probate system had no fundamental legal authority to superimpose their agenda over this constraint through the vehicle of a private lawsuit. [Citations.]"

Cross-defendants' counsel, who has represented himself as an "experienced appellate lawyer" who has "litigated dozens of appeals" and is "versed in this skill", then improperly included in the *statement of facts* excerpts from a publication that was neither admitted in evidence at trial nor was written by an attorney or other recognized legal authority. Under the heading, "**6. National Concerns about the American Probate System**," their statement of facts stated (or, more accurately, improperly argued):

> "Attorney Stoffel's violation was so serious that the following short recitation warrants inclusion in this brief.

> "This country's probate courts have come under national scrutiny in recent years. As explained in a 225-page award-winning book by a victim turned whistleblower, Michael Larsen:

> " [']Older, retired and/or defenseless citizens are being put to their death in illicit guardianship courts that operate

under color of law.  Their families are being falsely imprisoned and retaliated for speaking up to expose these crimes against humanity.

" [']Those with financial assets are targeted by rogue attorneys and guardians . . . fiduciaries designated by an elderly person in documents they have prepared are often cast aside or simply ignored and cases exist where . . . Living Trusts and similar instruments, once thought impenetrable, are broken making room for the fee-for-service professionals/attorneys in a system with no checks and balances.

" [']They are forcibly removed from their home.  Their family members are barred from seeing them on the basis of perjured false accusations against them by the predator attorneys . . . not only are these disabled and retired citizens being terrorized, but their family members and other[s] who expose this syndicate are also victims . . .[']

"(Larsen, M., Guardianship Fraud (2016) ISBN: 15432188383, p. xi-xii ('*Larsen*'); see Declaration of Benjamin Pavone, ¶¶ 1-2 [attaching copy of book, inexplicably rejected for filing on March 3, 2020]; [citations]."

"These concerns presented a systemic dysfunction risk that seemed eerily similar to tactics utilized and observed in this case.  They emanate from an apparently well-trodden method ('isolate, medicate, take the estate') where:

- "Probate insiders utilize trumped-up TROs as a method to isolate elders from their family and from their doctors [citations, including to *Larsen*];

- "Probate insiders create an alliance with a disgruntled family member, and on that person's authority, levy accusations against the elder's caretakers to remove them from their documented estate roles [citations, including to *Larsen*][;]

- "The probate court itself appoints or assists these insiders in ways they request [citations, including to *Larsen*];

41

- "The elder's assets are encumbered or liquidated, to provide funds for professionals to capitalize on [citations, including to *Larsen*][;]

- "The liquid funds are depleted by the professionals at the expense of the heirs [citations];

- "Resistance to the agenda of the insider professionals is projected to be futile, given certain intimidation tactics practiced by the professionals in conjunction with the court [citations]. (Fn. omitted.)

"Undersigned counsel was jarred, worried, and at a few moments profanely apoplectic, by the possibility that these accusations of dysfunction were real and were part of a pre-ordained process happening to his client - *that counsel could not stop*. [Citations, including to *Larsen*.]"

Regarding P&F's invoices, Cross-defendants' statement of facts included their explanation for the nine-month delay in sending Willis its fourth invoice, stating:

"The truth is that by February-March 2016, P&F was drowning in trying to keep up with the San Diego case obligations. [Citations.] [¶] On top of that, the Indiana trial loomed as set for April 18, 2016. [Citation.] P&F was unable to get a continuance and filed a detailed motion to dismiss, but the Indiana Court did not budge. [Citations.] [¶] *On top of all that*, counsel was also obligated to try an entirely different case in March 2016, in Orange County; counsel spent a week engrossed with that. [Citation.] [¶] After the February-March San Diego scramble, the February-March Orange County trial, and the March-April Indiana trial, P&F counsel and his team practically collapsed, not to mention getting backed up on all of their *other* cases. [Citations.] [¶] This is the actual reason invoices in *Willis* for February, March, and April 2016 were not tendered by June 1, 2016: a crushing workload. [Citation.]

"As for the next cycle, on June 30, 2016, Teresa dies on June 21, 2016; P&F hesitated to pile more bad news on fragile [Willis]. [Citations.] [¶] For July and August, 2016,

42

P&F made a third decision to hold off a little longer until [Willis] had the ability to pay. [Citation.] The concentration of legal work required in February-March-April had ratcheted up a big legal bill and [Willis] had no way to pay for it. [Citation.] [¶] In September, 2016, a settlement with [the] successor trustee was reached that enabled the refinance of [the Aladin property], P&F elected to hold the bill until [Willis] had a way to pay it down. [Citations.] [¶] In summary, P&F's delay in billing reflects prioritization of winning over billing, and thereafter, kindness not avarice."

In concluding their *statement of facts*, Cross-defendants again make an *argument* that would be more appropriately addressed to a trier of fact than to an appellate court, stating: "It is not uncommon for clients to diminish the value of a legal effort after they have secured victory, and it is practically standard for clients to claim the victory could have been secured less expensively. [¶] However, this case is exceptional even against this common client griping, where the client covets the victory, gets the bill, and then not only contends it was excessive but reverses her perception of the representation to its polar opposite, by re-characterizing an industrious and successful legal effort to one that was nothing more than an incompetent, premeditated conspiracy against her." (Fn. omitted.)

While stating "facts" almost exclusively in their favor, Cross-defendants' statement of facts in their appellants' brief also consistently omitted material evidence favorable to Willis that supported the judgment in her favor. For purposes of brevity, we need not cite *all* the material evidence so omitted. Rather, based on our independent review of the extensive record on appeal, we set forth below selected examples that reflect material evidence that Cross-defendants should have, but did not, include in their statement of facts. First, Cross-defendants did not include any discussion of the fact that prior to P&F's involvement in the summer of 2015, Stoffel, representing

43

Teresa, and Freed, representing Willis and her family, had agreed that an independent trustee (i.e., Fister) should be appointed for the Trust and could also act as Teresa's conservator. Toward that goal, Stoffel filed a petition in the probate court on behalf of Teresa, seeking an order removing Billena and Willis as the Trust's successor trustees and appointing a professional trustee (i.e., Fister) to manage the Trust and its estate.

Second, Cross-defendants omitted any discussion of the fact that Pavone sent Willis a September 15, 2015 letter, discussing the probate court petition filed by Stoffel to remove Willis as trustee of the Trust, acknowledging the October 6, 2015 hearing date, and emphasizing that "we need a strong opposition with our own documentation and declarations" and "we would like to file a written opposition before that date [i.e., October 6]." He also proposed that he "immediately prepare an opposition to the current petition." Cross-defendants omit any reference to the fact that, despite Willis's execution of the Agreement on September 24 and contrary to Pavone's stated strategy in his September 15 letter, he did not file any pleadings or other documentation opposing Stoffel's petition and merely appeared at the October 6 hearing on Willis's behalf in opposition to the petition. Nevertheless, Willis apparently was relieved that Fister, a professional fiduciary, was appointed by the probate court to serve as the successor trustee of the Trust because Willis had spoken to Fister a couple of times and believed Fister knew what was best for Teresa's estate and understood the family's situation with Barbara and Mundavuozzo.

Third, Cross-defendants' statement of facts wholly omits any discussion of Pavone's January 2, 2016, e-mail to Willis and her family members requesting a "Come to Jesus" meeting with them after the upcoming hearing in the probate court. In that e-mail, Pavone stated: "The forces we are up against are organized, experienced and serious. And while we started strong,

44

I feel like the family's energy to fight is collapsing. [¶] . . . The family needs to rally" and stated, if it does not, "Teresa will not be returned home, ever, and the entire $2M estate will get stolen."

Fourth, Cross-defendants' statement of facts omitted any discussion of Pavone's testimony admitting that he had led Willis to believe for over a year that the probate court judge and other professionals were stealing the Trust's estate, that she was in a dogfight for her inheritance, that he never told Willis it was possible she would be paying the costs of both sides for Trust to, in effect, litigate with itself, and that those costs would amount to almost $1,000,000.

Fifth, Cross-defendants' statement of facts omitted any discussion of Stoffel's trial testimony in which he stated there was never any attempt to remove Willis as a beneficiary of the Trust, no paperwork was ever initiated to change the beneficiary of the Trust, and he had no conversations with Barbara regarding potentially changing the beneficiaries of Teresa's estate.

The extensive evidence described above (i.e., in the first through fifth paragraphs), which was omitted from Cross-defendants' statement of facts, was material to this case and appeal because it supported Willis's trial theory that much of Cross-defendants' litigation efforts, and attorney fees billed to her, were unnecessary and could have been avoided if Pavone had not taken an antagonist approach toward the appointment of a professional fiduciary as successor trustee of the Trust, as well as other litigation strategies, based on his ill-founded conspiratorial belief that Willis's entire inheritance was at risk of being "stolen" by Barbara, Stoffel, Fister, Grunow, and/or other third parties.

Sixth, Cross-defendants' statement of facts wholly omitted any discussion of certain terms of the Agreement that are material to this case and support the judgment. In particular, the Agreement set forth two main

45

priorities for P&F's representation of Willis, as follows: "(1) to recover custody of Teresa McClain, mother to Billena and grandmother to [Willis], from the abduction by third parties and to enable as much contact is [*sic*] possible while Billena is living; [and] (2) to protect Teresa's assets (including the family compound in Pacific Beach) from changes to its succession, as originally created and intended by the 2003 estate plan," and toward those efforts, the Agreement expressly estimated that Willis "could incur $100K (or conceivably more)" in P&F's attorney fees and costs. The Agreement also repeated Pavone's conspiratorial belief that third parties were attempting to steal Teresa's estate, stating: "[T]here is a substantial amount of real estate that is all in potential jeopardy due to the machinations of Barbara Carson, Christy Mundo and possibly others. While Barbara and Christy could fold and end the litigation easily and inexpensively, it is apparent that they are after Teresa's estate, have liquid funds to finance a fight, and are thus incentivized to wage a battle as long as they have a shot at capturing some or all of Teresa's wealth." That evidence, which was omitted from Cross-defendants' statement of facts, was material to the case and supported the judgment because it showed P&F had estimated its attorney fees and costs to be about $100,000, which amount was greatly exceeded by its fourth invoice dated September 20, 2016, which added its new fees and costs totaling $432,407 incurred during the eight and one-half month period from January 2016 through September 20, 2016, and then reduced the $619,299 total balance amount by $50,000 for mooted appellate work and $14,800 paid by the Willis family, for a net balance due of $578,415. That evidence was material to Willis's trial theory that, inter alia, Cross-defendants committed professional negligence by not reasonably informing her of significant developments in their representation of her. That excerpt from the Agreement was also material to this case and appeal because it supported

46

Willis's trial theory that much of Cross-defendants' litigation efforts, and attorney fees billed to her, were unnecessary and could have been avoided if Pavone had not based his litigation strategy on his ill-founded conspiratorial belief that Willis's entire inheritance was at risk of being "stolen" by Barbara, Stoffel, Fister, Grunow, and/or other third parties.

Seventh, Cross-defendants' statement of facts omitted any discussion of Burd's testimony during the instant trial in which she stated that after the probate court appointed Fister as the successor trustee of the Trust (per its October 6, 2015 order), "[n]o one would have had authority [to remove Willis as the beneficiary of the Trust] absent court order." Burd testified that "none of their opponents could change the beneficiary . . . [a]bsent a court order" and that she had discussed with Pavone that the beneficiary of the Trust could not thereafter be changed. Their statement of facts also omitted any discussion of Pavone's trial testimony that after Fister was appointed as the successor trustee of the Trust on October 6, 2015, Barbara had no power to sell any of the Trust's properties regardless of any intent to do so. Both Burd's and Pavone's trial testimony was material to this case and appeal because that evidence supported Willis's trial theory that much of Cross-defendants' litigation efforts, and attorney fees billed to her, after October 6, 2015 were unnecessary.

Eighth, Cross-defendants' statement of facts omitted any discussion of Willis's trial testimony that Pavone instructed her not to pay rent on the Aladin property and to oppose her eviction so that the Aladin property would not be sold. Pavone never told her that the probate court order appointing Fister as the Trust's trustee precluded a sale of the Aladin property without a further court order. He also did not inform her that her challenge to the Trust's ownership of the Aladin property would preclude her from being reinstated as trustee of the Trust, and he nevertheless continued to bill her

for work done to reinstate her as trustee.  Furthermore, Willis testified that if Pavone had informed her that challenging the Trust's ownership of the Aladin property would have forever precluded her from being reinstated as its successor trustee, she never would have agreed to challenge its ownership and, as a result, would not have incurred an additional $500,000 in attorney fees thereafter.  Willis's testimony was material to this case and appeal because it supported her trial theory that much of Pavone's litigation efforts, and attorney fees billed to her, were unnecessary and could have been avoided if Pavone had not advised Willis to assert an ownership interest in the Aladin property that was adverse to the Trust's interest and thereby disqualified her from being reinstated as the Trust's successor trustee.

In summary, based on our close, independent review of the record on appeal and Cross-defendants' statement of facts in their appellants' brief, we conclude their brief did not fairly state the material evidence in this case.  As shown by the specific examples discussed above, their statement of facts cited evidence almost exclusively in their favor and consistently omitted material evidence favorable to Willis that supported the judgment in her favor.  Based on Cross-defendants' failure to include a proper statement of facts in their appellants' brief, we conclude Cross-defendants have waived or forfeited all of their insufficiency of the evidence contentions.

To clarify which contentions we conclude Cross-defendants have so waived or forfeited, we list, as waived or forfeited, the following insufficiency of the evidence contentions raised in their appellants' brief:  (1) Argument 1, contending that there is insufficient evidence to sustain the fraud cause of action because there was no misrepresentation; (2) Argument 2, contending that there is insufficient evidence to sustain the fraud cause of action on the element of intent to deceive because P&F reasonably believed Barbara's team was angling to capture Teresa's estate; (3) Argument 3, contending that there

is insufficient evidence to sustain the fraud cause of action on the question of damages; (4) Argument 4, contending that there is insufficient evidence to sustain the breach of fiduciary duty cause of action; (5) Argument 5, contending that there is insufficient evidence to sustain the negligent misrepresentation cause of action; (6) Argument 6, contending that there is insufficient evidence to sustain the breach of contract cause of action; and (7) Argument 7, contending that there is insufficient evidence to sustain the legal malpractice (i.e., professional negligence) cause of action.[3]

---

[3]    Assuming arguendo Cross-defendants have not waived or forfeited their Arguments 1 through 7 based on their improper statement of facts as concluded above, we nevertheless would conclude they have failed to carry their burden on appeal to show the evidence, and reasonable inferences therefrom, favorable to the verdicts in Willis's favor is insubstantial.  Cross-defendants simply cite evidence, and inferences therefrom, in support of their position and, based thereon, make arguments, relying in large part on hypothetical scenarios and/or ill-founded conspiracy theories, more appropriately addressed to a trier of fact than to an appellate court.  Cross-defendants cannot carry their burden on appeal by merely rearguing the "facts" as they would have them and/or reasserting their position at trial.  (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531; *Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687.)  Such a "factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [appellants] at the trial level, contrary to established precepts of appellate review.  As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)

## II

### *Professional Negligence Cause of Action*

As we concluded in section I above, Cross-defendants waived or forfeited, inter alia, their Argument 7 by presenting an improper statement of facts in their appellants' brief. In their Argument 7, Cross-defendants contended the verdict finding them liable on Willis's cause of action for professional negligence must be reversed for insufficient evidence to support it because Willis did not designate, or present the testimony of, an expert witness regarding their breach of any duty owed to her. Because of the importance of this legal issue, we nevertheless elect to address the merits of their contention and explain why, in this exceptional case, Willis did not need an expert to testify that Cross-defendants breached their professional duty owed to her.

### A

*Applicable law.* The elements of a cause of action against an attorney for professional negligence are: "(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence. [Citations.]" (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199.) Generally, expert testimony is required to show an applicable duty of care and a breach of that duty on a professional negligence cause of action. (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1093; *Wright v. Williams* (1975) 47 Cal.App.3d 802, 810-811; cf. *Kirsch v. Duryea* (1978) 21 Cal.3d 303, 311 (*Kirsch*) [expert testimony is not always required to establish a standard of care].) However, there may some rare, exceptional cases in which the general rule requiring expert testimony does not apply. Specifically, "[w]here the failure of attorney

performance is so clear that a trier of fact may find professional negligence unassisted by expert testimony, then expert testimony is not required." (*Wilkinson v. Rives* (1981) 116 Cal.App.3d 641, 647–648 (*Wilkinson*); see also *Wright*, at p. 810; *Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1146 (*Day*); *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1239 (*Unigard Ins. Group*) [expert testimony may not be required where the question of breach of a duty of care is within the "common knowledge" of lay persons]; cf. *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.) "[I]f the attorney's negligence is readily apparent from the facts of the case, then the testimony of an expert may not be necessary." (*Goebel v. Lauderdale* (1989) 214 Cal.App.3d 1502, 1508 (*Goebel*); see also, Rest.3d, Law Governing Lawyers (2000) § 52, com. g. ["*Expert testimony. . . .* [A] plaintiff alleging professional negligence . . . ordinarily must introduce expert testimony concerning the care reasonably required in the circumstances of the case and the lawyer's failure to exercise such care. Such expert testimony is unnecessary when it would be plain to a nonlawyer or is established as a matter of law that the lawyer's acts constitute negligence . . . ."]; Brewer, Jr., *Expert Witness Testimony in Legal Malpractice Cases* (1994) 45 S.C. L.Rev., 727, 735 ["Courts that hold expert testimony is admissible and generally required in legal malpractice cases also recognize an exception to the expert testimony requirement when the alleged act of malpractice is clear and obvious, exceptionally egregious, or clearly palpable in that lay persons can determine from their own common knowledge and experience whether the attorney breached a standard of care."]; Michael P. Ambrosio & Denis F. McLaughlin, *The Use of Expert Witnesses in Establishing Liability in Legal Malpractice Cases* (1988) 61 Temp. L.Rev. 1351, 1373 ["[C]ourts have uniformly recognized an exception in those cases [requiring expert testimony] where the alleged act of malpractice is so clear

and obvious that lay persons can rely on their common knowledge and experience to conclude the act is a deviation from the standards of professional conduct."].)

"[T]he existence of the duty [of care] is a question of law." (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 894, 890 (*David Welch Co.*).) Statutes, rules of professional conduct, and general principles relating to fiduciary and attorney-client relationships "all help define the duty component of the fiduciary duty [or other duty of care] which an attorney owes to his client." (*Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 45 (*Mirabito*); see also *Day*, *supra*, 170 Cal.App.3d at p. 1147; *David Welch Co.*, at pp. 890–893 [statutes and rules of professional conduct help define attorney's duty of care].) While the existence of a duty of care is a question of law, the question of whether an attorney breached that duty of care is a factual question for the trier of fact. (*Unigard Ins. Group, supra,* 38 Cal.App.4th at p. 1240; *David Welch Co.*, at p. 890.)

B

*Analysis*. Contrary to Cross-defendants' claim, we conclude that the general rule requiring expert testimony to prove a breach of duty by them does not apply in the rare and exceptional circumstances of this case. Unlike the typical "case-within-a-case" legal malpractice cases, in this case Willis alleged that Cross-defendants failed, inter alia, to timely inform her of the large increase in P&F's invoice from January 2016 through September 20, 2016, which failure she argued violated their duty to reasonably inform her of significant developments in their representation of her.

At trial, the Agreement was admitted in evidence, including section 3.1 thereof that stated: "Attorney has estimated that Client could incur $100K (or conceivably more) for the serious litigation effort that is needed . . . ." Section 6.0 of the Agreement also stated that Willis did not have any liquid

assets to pay P&F for its legal services. There was also substantial evidence admitted showing the amounts and timing of each of P&F's invoices. In particular, on October 31, 2015, Pavone sent Willis P&F's first invoice for legal services rendered for a total amount of $107,093. On December 7, Pavone sent Willis P&F's second invoice for legal services, reflecting additional charges of $51,194 incurred during the month of November and a total outstanding balance of $162,087. At that time, Pavone stated that "this translates to about a $50K/mo[.] tab. This should come down substantially. The case is now stable. . . ."

On January 5, 2016, Pavone sent Willis P&F's third invoice, adding $26,805 in legal fees and costs for services rendered during December 2015, for a total outstanding balance of $186,892. Thereafter, despite its many court filings and appearances and performance of other legal services over a period of eight and one-half months, P&F did not send Willis its next invoice until its fourth invoice dated September 20, 2016. P&F's 44-page fourth invoice restated the outstanding balance of $186,892 from its prior three invoices and showed a net balance due of $578,415, reflecting a net increase of $391,523.

Willis also admitted in evidence, and had Pavone read for the jury, Business and Professions Code section 6068, which provides: "It is the duty of an attorney to do all of the following: [¶] . . . [¶] (m) To respond promptly to reasonable status inquiries of clients and to keep clients *reasonably informed of significant developments* in matters with regard to which the attorney has agreed to provide legal services." (Italics added.) Furthermore, Pavone admitted at trial that it was "fair to say that a bill going from a $100,000 [amount] to over $650,000 would be considered a significant development." Pavone further testified that he had established a special protocol with Willis that obligated him to call Willis, and not just e-mail her, if there was

"something that is important" in his representation of her or something that needed her attention. Pavone admitted that he did not follow that protocol regarding the bills he sent her, explaining that he did not feel a bill over $500,000 was that important or needed her attention. Pavone testified that he was "busy" from January through April 2016 and that "doing bills at the time was just not practical." He further explained that he did not send Willis a bill after their May "victory" because he had to catch up on other cases, knew it would be "a big bill," was dreading sending it, and knew she could not pay it anyway, and therefore he delayed sending the bill to her.

In her testimony, Willis testified regarding the special protocol she had with Pavone, which required him to call her if there was something important that she needed to see or respond to. However, Pavone never talked to her about sending her his bill.

In instructing the jury, the court instructed, inter alia, with Business and Professions Code section 6068, subdivision (m) that "it is the duty of an attorney to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services." In closing, Willis argued Pavone had failed to keep her reasonably informed about significant developments in his representation of her, including the large increase in P&F's bill. The jury returned special verdicts, including a verdict finding Cross-defendants liable for professional negligence and awarding Willis $47,000 in economic damages and $20,000 in noneconomic damages for that cause of action.

Based on the above evidence, we conclude lay persons could reasonably find that Cross-defendants breached their duty of care to keep Willis reasonably informed of significant developments in their representation of her without the assistance of expert testimony. In particular, the evidence showed that Cross-defendants originally estimated in the Agreement that

54

Willis's legal fees and costs would be about $100,000, that over the eight and one-half month period from January 5, 2016 to September 20, 2016, P&F's invoice amount increased from $186,892 to $578,415 for a net increase of $391,523, which total balance would be $628,415 after P&F's subsequent reversal of the $50,000 amount for mooted appellate work for an adjusted net increase of $441,523, and that Pavone admitted at trial such a large increase in her bill was a significant development in his representation of Willis. Given this rare, exceptional, and unique set of facts, the general rule requiring expert testimony to prove a breach of a duty of care did not apply.

Business and Professions Code section 6068, subdivision (m) sets forth a specific duty of care that Cross-defendants owed to Willis and any expert testimony contrary to that duty of care would be disregarded. (*Mirabito*, *supra*, 4 Cal.App.4th at p. 45; *Day*, *supra*, 170 Cal.App.3d at p. 1147; *David Welch Co.*, *supra*, 203 Cal.App.3d at pp. 890–893; *Kirsch*, *supra*, 21 Cal.3d at p. 311; cf. *Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163–165 (*Jorgensen*).) Given that duty of care, the jury then addressed the question of fact whether Cross-defendants had breached their duty to reasonably inform Willis of significant developments in matters with regard to which they agreed to provide legal services to her (i.e., matters regarding their representation of her). (Bus. & Prof. Code, § 6068, subd. (m).) Based on the evidence admitted at trial, we conclude the lay jurors could make that factual determination without the assistance of expert testimony. Given Cross-defendants' initial estimate that Willis's legal fees would be about $100,000, lay persons could apply their common knowledge to find that a four-fold (or greater) increase in that estimated amount was, in fact, a "significant development" in matters with regard to which they agreed to provide legal services to her (i.e., matters regarding their representation of her). (Bus. & Prof. Code, § 6068, subd. (m).) Furthermore, lay persons could

55

further apply their common knowledge to find that by failing to send Willis an updated P&F invoice showing that exponentially increased amount of legal fees for more than eight and one-half months, Cross-defendants did not "reasonably inform" her of that significant development. Accordingly, contrary to Cross-defendants' assertion, no expert testimony was required for Willis to prove that Cross-defendants breached their duty of care. (*Wilkinson, supra*, 116 Cal.App.3d at pp. 647–648; *Wright, supra*, 47 Cal.App.3d at p. 811; *Day, supra*, 170 Cal.App.3d at p. 1146; *Goebel, supra*, 214 Cal.App.3d at p. 1508; *Unigard Ins. Group, supra*, 38 Cal.App.4th at p. 1239; cf. *Jorgensen, supra*, 125 Cal.App.3d at pp. 163–165.)

Our conclusion is supported by apposite case law. In *In re Taylor* (Ind. 2001) 741 N.E.2d 1239 (*Taylor*), the Indiana Supreme Court addressed a similar fact pattern involving an attorney who told his client that his fees for representing her in a marital dissolution proceeding would be about $2,500 and that her husband would be asked to pay such fees. (*Id.* at p. 1240.) The client believed she likely would not be responsible for payment of any attorney fees. (*Ibid.*) In his retainer letter to the client, the attorney set forth his hourly rates, but did not explain the frequency with which she would receive bills. (*Ibid.*) Over the subsequent 13-month period, the attorney never prepared or sent the client any interim billings. (*Ibid.*) Furthermore, the client was unaware of how his fees were escalating during his representation of her. (*Ibid.*) At the dissolution trial, the attorney submitted an itemized statement of his fees totaling $12,696. (*Id.* at p. 1241.) In its judgment of dissolution, the trial court awarded the marital home to the client and ordered her husband to pay $3,500 toward her attorney fees. (*Ibid.*)

56

In a disciplinary proceeding against the attorney in *Taylor*, the hearing officer found the attorney had committed professional misconduct and submitted his report to the Indiana Supreme Court. (*Taylor*, *supra*, 741 N.E.2d at p. 1240.) The attorney then sought review of the hearing officer's findings by the Indiana Supreme Court. (*Ibid*.) Reviewing those findings de novo, the Indiana Supreme Court found, inter alia, that the attorney violated a rule of professional conduct that required him to "keep a client reasonably informed about the status of a matter." (*Id*. at pp. 1241–1242 & 1241, fn. 2.) *Taylor* stated:

> "While interim billing may not *per se* be required during every representation, the [attorney's] failure to do so in this case amounted to a lack of adequate communication with his client, as required by the *Rules of Professional Conduct*, given the amount by which the [attorney's] actual fees exceeded his initial projections, the client's expectation that she would not have any out-of-pocket legal expenses, and the presence of only two significant assets in the marital estate, neither of which was liquid. Failure to keep a client apprised of escalating fees may constitute a violation of Prof.Cond.R. 1.4. *See, e.g.*, *Matter of Grimm*, 674 N.E.2d 551 (Ind. 1996) (attorney violated Prof.Cond.R. 1.4(a) when he represented that attorney fees were taken care of after the first invoice but submitted a substantial bill for legal services at conclusion of representation). The client's inability to pay the fees was a reason to provide interim billing, not a justification for avoiding them; the importance of limiting her legal fees and the likelihood that the cost of attorney services would impact strategic decisions regarding the representation would have increased as the attorney bills mounted." (*Taylor*, *supra*, 741 N.E.2d at pp. 1241–1242.)

The court rejected the attorney's argument that his failure to provide interim billing to the client was not misconduct. (*Id*. at p. 1241.) Accordingly, the court concluded the attorney "violated Ind. Professional Conduct Rule 1.4(a)

by failing to provide notice or information to the client of her escalating legal bills" and, "[a]s a consequence of that omission," the attorney also "failed to keep the client adequately informed about the status of her case to the extent reasonably necessary to permit her to make informed decisions regarding the representation, in violation of Prof.Cond.R. 1.4(b)." (*Id*. at p. 1242, fns. omitted.)

Given its finding of misconduct by the attorney, *Taylor* then addressed the question of the appropriate sanction for that misconduct and imposed on him a two-year suspension from the practice of law, given the circumstances of the instant misconduct as well as his significant disciplinary history. (*Taylor*, *supra*, 741 N.E.2d at p. 1243.) In so doing, the court noted that the attorney "took advantage of this client for personal gain, *billing her nearly five times the amount he estimated the representation would cost, failing to advise her of the mounting legal fee*, and then ultimately obtaining her residence in satisfaction of his fee." (*Ibid*., italics added.)

Another case, *In re Grimm* (Ind. 1996) 674 N.E.2d 551 (*Grimm*), cited by *Taylor*, provides additional support for our conclusion. (*Taylor*, *supra*, 741 N.E.2d at pp. 1241–1242.) In *Grimm*, the client retained an attorney to represent her in a marital dissolution proceeding. (*Grimm*, at p. 552.) "At the outset, the [attorney] told her that he did not believe that his legal fees and expenses for the contemplated dissolution would exceed $2,500." (*Ibid*.) The attorney subsequently sent the client monthly invoices for about six months, which invoices billed her for $2,028.18 for legal services and expenses and of which the client had paid $1,045. (*Ibid*.) Thereafter, the attorney pursued a romantic relationship with the client and did not send her any further invoices. (*Ibid*.) The client eventually terminated their personal relationship, but the attorney continued to represent her in the dissolution proceeding. (*Ibid*.) After the dissolution judgment was entered, the attorney

filed a notice of intention to file a lien against the real property awarded to the client, which lien stated that he sought $12,718.18 in attorney fees. (*Id.* at pp. 552–553.) However, the attorney had not sent her an invoice for legal services for over 10 months and did not provide her with the notice of filing. (*Id.* at p. 553.) After a trial on the attorney's lien for legal services, the court awarded him $9,916.94, plus prejudgment interest. (*Ibid.*)

In the subsequent disciplinary hearing, the hearing officer found, inter alia, that the attorney "violated Prof.Cond.R. 1.4(a) and 1.7(b) by failing to inform the client of escalating charges for legal services which far exceeded his initial projections and by failing to notify the client of his filing of the notice." (*Grimm, supra,* 674 N.E.2d at p. 553.) On reviewing the hearing officer's findings, the Indiana Supreme Court concluded, inter alia, that "[t]he [attorney's] failure to inform the client of the escalating legal bill after December 10, 1987 and his failure to provide notice to her of his filing of the notice violated Prof.Cond.R. 1.4(a) in that he failed to keep her adequately informed about the status of her case . . . ." (*Id.* at p. 554.) Based on the circumstances of that case, the court imposed on the attorney a one-year suspension from the practice of law. (*Id.* at p. 555.)

The facts and the rules of professional conduct in *Taylor* and *Grimm* are not unlike those in the instant case. Like Indiana Professional Conduct Rule 1.4(a) that required an attorney to keep a client adequately informed about the status of their case (see *Taylor, supra,* 741 N.E.2d at pp. 1241–1242 & 1241, fn. 2; *Grimm, supra,* 674 N.E.2d at p. 554), Business and Professions Code section 6068, subdivision (m) here required Cross-defendants to keep Willis reasonably informed of significant developments in matters with regard to which they agreed to provide legal services to her (i.e., matters regarding their representation of her). Also, in *Taylor* and *Grimm,* the clients had little or no liquid assets and the attorneys gave their clients

initial estimates of $2,500 for their fees and costs and thereafter did not send their clients invoices for extended periods (i.e., 13 months and 10 months), while the amounts of their fees and costs (i.e., $12,696 and $12,718.18) escalated beyond those initial estimates. (*Taylor*, at pp. 1240–1241; *Grimm*, at pp. 552–553.) Also, in *Taylor*, the attorney led his client to believe that someone else (i.e., her husband) would ultimately pay her attorney fees and she would not be responsible to pay them. (*Taylor*, at p. 1240.) Like in *Taylor*, the evidence in this case supported a finding that Pavone led Willis to believe that others (i.e., those persons involved in his perceived conspiracy to steal Teresa's estate), and not she, would ultimately pay his attorney fees because he would successfully pursue a civil action against them on her behalf. Although the instant case involves a fee dispute rather than a disciplinary proceeding, there are factual parallels that support our conclusion that the jury could find Cross-defendants breached their duty to keep Willis reasonably informed about her case without the assistance of expert testimony. Here, the Agreement noted that Willis had no liquid assets to pay attorney fees and P&F initially estimated therein that her fees and costs would be about $100,000. However, P&F's fourth invoice billed Willis *additional* fees amounting to four times (i.e., $432,407) and *total* fees of about six times (i.e., $578,415) more than its initial $100,000 estimate.[4] Furthermore, P&F waited over eight and one-months after sending Willis its third invoice to send her its next invoice (i.e., its fourth invoice dated

_____

[4]     As discussed above, P&F's 44-page fourth invoice restated the outstanding balance of $186,892 from its prior three invoices and showed a net balance due of $578,415 for a net increase of $391,523. Considering P&F's subsequent reversal of its $50,000 reduction for mooted appellate work, the adjusted total balance was $628,415 for an adjusted net increase of $441,523.

September 20, 2016), while the amount of its fees and costs escalated and far exceeded its initial $100,000 estimate. Similar to the courts' findings in *Taylor*, *supra*, 741 N.E. 2d at pages 1241 to 1243, and *Grimm*, *supra*, 673 N.E.2d at page 554, the jury here could find, albeit based on its common knowledge, that such an exponential increase in the amount of Willis's legal fees over P&F's initial $100,000 estimate, along with P&F's failure to keep Willis apprised of its escalating legal fees over the lengthy eight and one-half period, constituted a breach of P&F's duty to keep her reasonably informed of significant developments within the meaning of Business and Professions Code section 6068, subdivision (m).[5]

Accordingly, we conclude there is substantial evidence to support the jury's finding that Cross-defendants breached their duty of care to Willis, despite the absence of any expert testimony on that issue. Cross-defendants do not cite any case or other authority persuading us to reach a contrary conclusion. Because Cross-defendants do not make any substantive argument that there is insufficient evidence to support the jury's findings on the remaining elements of a cause of action for professional negligence (i.e., causation and damages), we need not, and do not, address the substantial evidence that supports the jury's findings on those elements.

---

[5] In addition, the jury could have reasonably found Cross-defendants violated Business and Professions Code section 6068, subdivision (m) by also not reasonably informing Willis of the following significant developments in her case: (1) the October 2015 probate court order appointing Fister as the Trust's trustee precluded a sale of the Aladin property thereafter without a further court order; and (2) her January 2016 challenge to the Trust's ownership of the Aladin property would prevent her reinstatement as the Trust's successor trustee (and nevertheless billing her an additional $500,000 in attorney fees thereafter).

61

# III

## *Trial Court's Interpretation of Willis's Answer*
## *to the FAC as Applying to P&F*

In their Argument 8, Cross-defendants contend that the trial court erred by interpreting Willis's answer to their FAC as applying to P&F and, based thereon, denying their request for a default judgment in P&F's favor.

### A

Before Willis answered the original complaint filed solely by LOBP, LOBP apparently requested a default judgment, but subsequently withdrew that request and informed the trial court it would file a FAC. LOBP thereafter filed its FAC that added P&F as a plaintiff. In answering the FAC, Willis did not expressly address P&F as a plaintiff and simply denied "all allegations of the FAC." Her answer consistently referred to the "plaintiff" in the singular, rather than to "plaintiffs." Her answer's caption also omitted any express reference to P&F.

P&F subsequently moved for a default judgment based on Willis's purported failure to answer the FAC as to it. On August 1, 2018, the court denied P&F's motion. It initially noted that the court clerk had denied P&F's previous April 30, 2018 and May 2, 2018 requests for entry of default against Willis. In denying the motion, the court stated:

> "The [FAC] added allegations, including separate causes of action for P&F. However, the allegations from the original complaint going forward was that P&F was a party allegedly damaged and the claims were assigned to LOBP. Defendants filed an answer, denying the claims. Therefore, the requests for defaults were properly rejected."

### B

Cross-defendants do not carry their burden on appeal to show that the trial court abused its discretion by denying their motion to compel entry of

default against Willis.  Although they correctly note that P&F was added as a plaintiff in their FAC, they do not show that Willis's answer to the FAC was ineffective under Code of Civil Procedure section 585 and therefore P&F was entitled to a default judgment in its favor.

Code of Civil Procedure section 585 sets forth the requirements for default judgments, stating:  "Judgment may be had, if the defendant fails to answer the complaint, as follows: . . . ."  Here, Willis clearly filed an answer to the FAC, thereby presumptively precluding a default judgment against her.

In moving for a default judgment below, P&F argued that it was entitled to a default judgment because her answer did not specifically include or address P&F, as opposed to the sole original plaintiff (LOBP), and used the singular term "plaintiff."  Cross-defendants repeat that argument on appeal. However, in so doing, they ignore the general rule regarding interpretation of answers and other pleadings, which is set forth in Code of Civil Procedure section 452:  "In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties."  In denying P&F's motion for a default judgment, the court noted that Willis's answer denied all allegations of the FAC.  In so doing, the trial court presumably interpreted Willis's answer to the FAC as including P&F together with LOBP, the original plaintiff, and further presumably applied the general rule of liberal construction of pleadings.  (Code Civ. Proc., § 452.)  Accordingly, the court properly interpreted Willis's denial of all allegations of the FAC as implicitly, if not explicitly, denying all allegations of the FAC, whether alleged by LOBP and/or by P&F.

IV

*Instructions and Arguments on P&F's Charging Lien*

In their Argument 9, Cross-defendants contend the trial court erred by instructing on, and Willis erred by arguing in closing regarding, P&F's charging lien. In particular, they argue the court had a duty to sua sponte instruct that a charging lien need not be recorded to be valid and enforceable between the parties.

A

Cross-defendants note that an e-mail from Pavone informed Willis that because she had been removed as the successor trustee of the Trust, P&F could no longer record its charging lien against Trust property. They argue the court erred by rejecting their proposed instructions regarding charging liens and their enforceability and Willis inaccurately argued in closing that P&F's failure to record the lien invalidated it. They assert that, based on those errors, the jury rejected P&F's conversion cause of action, finding that P&F did not own or possess, or have a right to possess, money proceeds from the sale of the Oliver property. As explained below, we conclude that Cross-defendants have waived or forfeited their contention because they make only a conclusory argument regarding error and wholly omit any argument showing prejudice from that purported error.

B

*Legal principles.* "The burden of affirmatively demonstrating error is on the appellant." (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971 (*Fundamental Investment*).) "An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*).) "Issues do not have a life of their own: if they are not raised or

64

supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 (*Jones*).) Accordingly, an appellant may be deemed to have waived or forfeited an argument on appeal if its appellate briefs do not support that argument by pertinent or cognizable legal argument or analysis or proper citation of authority. (*Benach*, at p. 852; *Jones*, at p. 99.) Furthermore, an appellant waives or forfeits contentions that are conclusory and supported only by counsel's opinion or argument without citation to any recognized legal authority. (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 (*Ewald*).)

Also, if a party does not object to a specific action in the trial court, that party is generally precluded from challenging that action on appeal and is deemed to have waived or forfeited that purported error. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 (*Keener*); *In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*).) In particular, an appellant may not challenge a jury instruction that is correct in law as being too general or incomplete unless it requested a clarifying instruction below. (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131.) Furthermore, an appellant must show on appeal that its proffered, but rejected, instructions were correct statements of law and should have been given in addition to, or place of, the trial court's instructions. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573 (*Soule*); *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1087 (*Morgan*) [party is entitled on request to correct, nonargumentative instructions on every theory of the case advanced by it that is supported by substantial evidence].) An instruction should state rules of law generally without overemphasizing portions of the evidence or, in effect, making an argument to the jury. (*Slayton v. Wright* (1969) 271 Cal.App.2d 219, 238.)

Furthermore, to preserve a claim of misconduct or other error by opposing counsel below, an appellant generally must both: (1) make a timely and proper objection below; and (2) request that the jury be admonished. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 794–795 (*Cassim*); *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1411–1412 (*Rayii*).) If appellant fails to do so, that purported misconduct or other error is generally deemed to be waived or forfeited. (*Cassim,* at p. 794–795; *Rayii*, at p. 1412.)

Regarding prejudice, the California Constitution provides that "[n]o judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Accordingly, prejudice is not presumed from an error, but instead the appellate court must examine the evidence to determine whether the error did, in fact, prejudice the appellant. (*Cassim*, *supra*, 33 Cal.4th at p. 800.) Prejudice under that state law standard has been described as requiring the appellant to show that it probably would have obtained a more favorable result at trial had the error not occurred. (Code Civ. Proc., § 475; *Cassim*, at pp. 800–802; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Code of Civil Procedure section 475 provides: "No judgment . . . shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

In particular, in the context of instructional error, the error is prejudicial only "when is appears probable that the improper instruction misled the jury and affected the verdict." (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213; see also, *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682; *Soule*, *supra*, 8 Cal.4th at pp. 580–581.)  To the extent Cross-defendants assert Willis in representing herself violated duties equivalent to those governing attorney misconduct, we note an appellate court independently determines the prejudicial effect of that misconduct by considering:  (a) the nature and seriousness of the misconduct; (b) the general atmosphere of the trial, including the judge's control of it; (c) the likelihood the jury was actually prejudiced; and (d) the efficacy of objections or admonitions.  (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 296; *Martinez v. State of California Dept. of Transportation* (2015) 238 Cal.App.4th 559, 568.)  On appeal, the appellant generally has the burden of affirmatively demonstrating prejudicial error. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1059, 1069 (*Pool*); *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308–310 (*Citizens for Open Government*).)

C

*Analysis*.  We conclude Cross-defendants waived or forfeited their contention that the trial court erred by rejecting their proposed instructions regarding charging liens and their enforceability.  First, they do not include in their appellants' brief the actual language of the instructions they requested on charging liens.  At most, their appellants' brief merely cites to the record (i.e., "2 RT 301; 13 [AA] 8334") where they purportedly requested instructions on that issue.  We have reviewed both cited pages and neither sets forth the instructions purportedly requested by Cross-defendants.  It is not an appellate court's duty to search the record for evidence or other documents to support an appellant's argument, nor is it the court's duty to

67

then conduct legal research necessary to support the appellant's argument. Rather, it is the appellant's duty to do so. By failing to set forth the instructions on charging liens that they purportedly requested and the court rejected, Cross-defendants have waived or forfeited their contention that the court erred by rejecting those instructions. Furthermore, Cross-defendants have made no attempt to show their requested instructions were correct statements of law and, even if the court erred by rejecting them, that the purported error was prejudicial. Based on those multiple failures, Cross-defendants have waived or forfeited their contention that the court prejudicially erred by rejecting their requested instructions on charging liens. (*Soule, supra,* 8 Cal.4th at p. 573; *Morgan, supra,* 60 Cal.App.5th at p. 1087; *Benach, supra,* 149 Cal.App.4th at p. 852.)

Similarly, Cross-defendants have waived or forfeited their argument that Willis committed misconduct by inaccurately arguing the law on charging liens by merely citing to the reporter's transcript (i.e., "10 RT 2117") where Willis made that closing argument and by: (1) not citing to the record showing that they timely objected to that argument below and requested a curative admonition; (2) failing to show that a curative admonition would not have cured any prejudice from that purported misstatement of law; and (3) failing to make any substantive legal argument showing that the purported misstatement of law was prejudicial. (*Cassim, supra,* 33 Cal.4th at pp. 794–795; *Rayii, supra,* 218 Cal.App.4th at pp. 1411–1412; *Pool, supra,* 42 Cal.3d at p. 1069.) Accordingly, we need not, and do not, address the merits of Cross-defendants' contentions regarding instructions and/or closing arguments on P&F's charging liens.

## V

### *Irreconcilable Verdicts*

In their Argument 10, Cross-defendants contend the jury's special verdicts are irreconcilable and must be vacated. They argue that P&F's total bill was $675,000, the jury "validated" $457,000 for legal services it rendered, Willis paid $173,000, leaving an outstanding balance of $284,000, and the jury awarded her a total of $287,000. To persuade us that the jury's special verdicts are irreconcilable, they simply argue: "These verdicts are irreconcilable. Now [18] months after the event, counsel has been unable to dream up a construct by which a verdict that validates $475,000 worth of legal services as legitimately earned can simultaneously establish that $284,000 worth of those services were also tortious. . . . [¶] Without the presentation of some extraordinary theory (and supporting evidence) that reconciles how those same appropriate and reasonable services were also tortious, the two verdicts contradict each other and must both be invalidated."

By so arguing, Cross-defendants have failed to carry their burden on appeal to show error. Instead, they simply make a conclusory argument that the special verdicts are irreconcilable because their appellate counsel cannot think of any reason how they could be reconciled. Furthermore, they do not present any substantive legal argument or authority in support of their apparent position that verdicts are irreconcilable if a jury finds in favor of an attorney on a common count for the reasonable value of legal services rendered and then further finds in favor of the client on various tort causes of action alleged against that attorney. By failing to make any such substantive argument with citations to supporting legal authority, Cross-defendants have waived or forfeited their contention on appeal. (*Benach*, *supra*, 149 Cal.App.4th at p. 852; *Ewald*, *supra*, 13 Cal.App.5th at p. 948.) Accordingly,

we need not, and do not, address the merits of Cross-defendants' contention that the jury's special verdicts are irreconcilable.[6]

## VI

### *Chance Verdict*

In their Argument 11, Cross-defendants contend that the jury's special verdicts in Willis's favor must be either vacated as invalid chance verdicts or reduced for duplication.

### A

As described above, the jury returned special verdicts on Willis's cross-complaint finding in her favor on her causes of action for: (1) intentional misrepresentation (fraud), awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (2) negligent misrepresentation, awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (3) breach of fiduciary duty, awarding her $40,000 in economic damages and $20,000 in noneconomic damages; (4) breach of contract, awarding her $40,000 in economic damages; and (5) professional negligence, awarding her $47,000 in economic damages and $20,000 in noneconomic damages.

### B

Citing the special verdicts' "repetition," Cross-defendants argue the special verdicts necessarily reflect a chance verdict by the jury and therefore must be vacated. They cite Code of Civil Procedure section 657, which states:

---

[6] We nevertheless note that verdicts are inconsistent when they are beyond the possibility of reconciliation under any possible application of the evidence and instructions. (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716.) However, "[i]f any conclusions could be drawn thereunder which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540–541.)

"The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 2. *Misconduct of the jury*; and whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, *by a resort to the determination of chance*, such misconduct may be proved by the affidavit of any one of the jurors. . . ." (Italics added.) However, in so arguing, Cross-defendants do not show that: (1) they filed a motion for new trial based on the purported chance verdict by the jury; (2) the trial court erred by denying that motion; and (3) such purported error was prejudicial. In particular, they do not cite to the record showing that they submitted an affidavit of one of the jurors showing the jury's verdicts were the result of chance. (Code Civ. Proc., § 657(2).) Absent such proof, Cross-defendants simply speculate that the jury's verdicts must have been the result of chance because their counsel cannot think of any way the verdicts' awards could have been otherwise determined. They assert: "There is no plausible scenario based on the evidence by which [Cross-defendants] caused exactly $60,000 worth of damages across four different causes of action, each with separate elements, and each necessarily with different factual theories (or else duplicative and reversible). Such a verdict is only possible with odds into the billions—in other words, it cannot and did not happen in any accurate assessment of these facts applied to the law by this jury. The defense findings are a quotient verdict." Cross-defendants then challenge Willis to defend the jury's damage awards, stating: "P&F challenges the defense to dream up a factual construct on this record" to support the jury's awards. They conclude by

71

asserting that the total amount of the jury's awards to Willis are "conveniently . . . just higher than" its award to Cross-defendants.

However, by so arguing, Cross-defendants do not discuss, much less cite, evidence in support of each of the jury's findings in Willis's favor on each of the five causes of action in the cross-complaint or, in particular, the evidence in support of the jury's awards of economic and noneconomic damages on each of those causes of action. They wholly ignore the evidence in support of the jury's damage awards and argue, in a speculative and conclusory manner, that the jury's damage awards could not possibly be result of anything other than a chance verdict. By so doing, they have not carried their burden on appeal to present a substantive legal argument, containing citations to the evidence in the record and supporting legal authorities, showing the jury's damage awards are invalid as quotient or chance verdicts. By failing to make any such substantive legal argument with citations to the evidence in the record and supporting legal authorities, Cross-defendants have also waived or forfeited their contention on appeal.[7] Accordingly, we need not, and do not, address the merits of Cross-defendants' contention that the jury's damage awards must be invalidated as quotient or chance verdicts or reduced for duplication.

VII

*Admission of Evidence of Pavone's Sexual Misconduct*

In their Argument 12, Cross-defendants contend the trial court erred by admitting Willis's evidence of Pavone's alleged sexual misconduct. In particular, he argues the court abused its discretion under Evidence Code

---

7 (*Benach*, *supra*, 149 Cal.App.4th at p. 852; *Ewald*, *supra*, 13 Cal.App.5th at p. 948.)

section 352 by allowing Willis to testify about a small hook in Pavone's bedroom and his "flirting" when he described various sexual positions that he wanted to engage in with Willis.[8] They argue that testimony should have been excluded by the court because it was irrelevant, inflammatory, and unduly prejudicial. (Evid. Code, § 352.)

We conclude Cross-defendants have, once again, failed to carry their burden on appeal. First, they do not cite to the record showing that they timely objected to the challenged testimony on the specific basis it was irrelevant, inflammatory, or unduly prejudicial. If a party does not timely object to admission of evidence, that party is generally precluded from challenging on appeal its admission and is deemed to have waived or forfeited that purported error. (Evid. Code, § 353 [verdict shall not be set aside, nor judgment be reversed, "by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear

---

[8] To more accurately portray the challenged testimony, we quote the following testimony by Willis in which she described a meeting she had with Pavone at a restaurant, stating: "Mr. Pavone started to talk to me about my boyfriend at the time. Saying that because he was a younger man he probably wasn't able to fulfill my needs. He started talking about his sexual experiences in regards to sexual positions he liked. And he told me that he knew, because I was younger, I probably didn't have much experience. He was telling me that younger guys normally don't know how to please women. That you need an older man with experience in order to fulfill your needs. At that time I almost got like a pit in my stomach. I don't really know how else to explain it. Because I was so uncomfortable with the conversation, and I didn't unfortunately know how to confront Mr. Pavone about that. So instead of saying, you know, this is extremely inappropriate, I faked a call that I needed to leave, something had come up, and I wanted to go." She further testified that she declined Pavone's invitation to go back to his house to unwind and have some drinks with him.

the specific ground of the objection or motion"]; *People v. Delgado* (2017) 2 Cal.5th 544, 580 (*Delgado*) [appellant forfeited claim of erroneous admission of evidence by failing to object to that evidence below].)  Second, they do not present any substantive legal argument with citations to the evidence and supporting legal authority showing the trial court abused its discretion under Evidence Code section 352 or otherwise erred by admitting the challenged evidence.  Finally, they do not present any substantive legal argument on the issue of prejudice and simply argue, in a conclusory manner, that the purported error was prejudicial.  By so doing, they have not carried their burden on appeal to present a substantive legal argument, containing citations to the evidence in the record and supporting legal authorities, showing the trial court erred and that its error was prejudicial, and therefore have, in effect, waived or forfeited their contention on appeal.[9]  Accordingly, we need not, and do not, address the merits of Cross-defendants' contention that the court prejudicially erred by admitting Willis's testimony regarding Pavone's sexual statements to her.

VIII

*Willis's Withdrawal of Her Stipulation to Exhibits*

In their Argument 13, Cross-defendants contend the trial court erred by allowing Willis to withdraw her pretrial stipulation to admission of 294 exhibits that they intended to offer in evidence at trial.  In addressing their contention, we preliminarily note that "[a] trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner in a manifest

---

9  See footnote 7 above for supporting case citations.

74

miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 (*Rodriguez*).)

A

*Procedural background.*  In their joint trial readiness conference report, Cross-defendants, Willis, Jerne, and McCall listed exhibits they intended to offer in evidence at trial, including, inter alia, 529 exhibits to be offered by Cross-defendants.  The report stated:  "Plaintiffs' exhibit list is attached hereto as Exhibit A."  Exhibit A, which was attached to that report, consisted of Cross-defendants' list of 529 exhibits, which identified each exhibit by its number, date, a brief description or title, and the type of objection, if any, to that exhibit.[10]  Based on those exhibits, Cross-defendants apparently prepared certain charts and tables that they planned to use at trial to explain their version of the case.

During his trial testimony, Pavone, on behalf of Cross-defendants, offered in evidence all of the exhibits to which the parties had stipulated as admissible.  The following day, outside the presence of the jury, Willis, acting in pro per, objected to the admission of many of the exhibits to which she stipulated in the parties' joint trial readiness conference report, arguing, inter alia, that the majority of them were irrelevant.  The court then stated it would consider each exhibit one at a time in ruling on its admissibility.  In response, Pavone argued that Willis and her sisters could not object to Cross-defendants' exhibits because they had stipulated to their admissibility before trial.  The court then inquired of Willis about the parties' stipulation to

---

[10]  In Exhibit A to that report, the digit "1" was used to identify certain exhibits to which Willis, Jerne, and McCall had no objection and, in effect, stipulated to their admission.

75

admission of exhibits.  Willis explained the circumstances of their stipulation, stating:

> "So the issue with that was Mr. Pavone provided us a list with his names of what he said the exhibits were.  It wasn't until my sisters flew in that we were provided a flash drive with the actual exhibits on it.  And after reviewing them, Your Honor, like we stated—it's almost 5,000 pages and it's completely irrelevant, so we didn't have the actual exhibit[s] in front of us.  We just had Mr. Pavone's name [for the exhibit], which a lot of the times was very misleading.  What he was naming it versus what he's actually now trying to show the Court, we didn't have it in front of us."

The court then summarized the issue regarding the parties' stipulation, stating:

> "[W]hat they're saying is the descriptions didn't give them insight in terms of what those exhibits were and that they were surprised to see what the exhibits actually were.  So I don't know what to do.  It doesn't sound like you had a real stipulation there.  That's just where I'm at . . . ."

Later that day, outside the presence of the jury, the court revisited the issue of the parties' stipulation, stating:

> "I also like to have a little bit better control over the exhibits so I'm in a position to see -- given the disparity, honestly, that exists between a trained lawyer versus three persons who have no training in the law, it makes me more comfortable to actually see the exhibits that are being admitted and to make judgments on those also. [¶] So—and *I don't think that you guys think you thought you had a stipulation*, but I don't think it's going to end up where I'm just going to throw my hands up and go—I mean, honestly, I don't know."  (Italics added.)

Revisiting that issue later outside the presence of the jury, the court stated:

76

"[Willis, Jerne, and McCall] are telling me that they didn't realize what the exhibits really were by their descriptions, and so we have an issue. So that's all I can tell you. So let's do the best we can under the circumstances. *I can't force a stipulation on a party under those circumstances.*" (Italics added.)

After the jury returned its special verdicts and the court entered judgment based thereon, Cross-defendants filed a motion for new trial, arguing, inter alia, that they were denied a fair trial because the court declined to enforce the parties' pretrial stipulation to admission of 294 exhibits to be offered by Cross-defendants. In particular, Cross-defendants complained that the trial court had "affirmatively coach[ed] [Willis, Jerne, and McCall] about the wisdom of their legal stipulations" and erred by "signal[ing] to [them] that they might want to revisit their [pretrial] exhibit stipulation." In support of that motion, Cross-defendants submitted a declaration from Pavone in which he described the discussions and rulings regarding the parties' pretrial stipulation and admissibility of their exhibits and local court rules regarding joint trial readiness conferences (JRTCs). In particular, Pavone stated that "responsible attorneys rely on JRTC stipulations, and have every right to do so given the local rules and practice" and there is nothing to suggest that such stipulations "are merely advisory or adopted as a professional courtesy." The court denied Cross-defendants' motion for new trial.

B

*Analysis.* Cross-defendants argue on appeal that the trial court erred by not enforcing the parties' pretrial stipulation to the admissibility of the 294 exhibits to be offered by Cross-defendants and instead allowing Willis to object to each exhibit offered by them at trial. However, in so arguing, they minimize the significance of the fact that at the time Willis and her sisters

77

stipulated to admission of the 294 exhibits, they did not have complete copies of the exhibits for their review and, instead, had only short, and oftentimes vague, descriptions of, or titles for, them. Cross-defendants simply argue, without citation to supporting legal authority, that Willis and her sisters had no "legitimate basis for abandoning [their] stipulation" and presented the court with only a "bogus excuse" for disavowing their pretrial stipulation.

We conclude that Cross-defendants have not carried their burden on appeal to show the trial court abused its discretion by allowing the pro per defendants (i.e., Willis, Jerne, and McCall) to object at trial to each exhibit offered by Cross-defendants based on their inability to review the exhibits at the time of their pretrial stipulation and, as a result, excluding certain charts or "pictorial exhibits" prepared by Cross-defendants explaining those exhibits. Cross-defendants' argument that the court abused its discretion is improperly made in a conclusory manner. Cross-defendants' citation to a local superior court rule (i.e., "Local Rule 2.1.15") regarding JTRC reports is wholly inadequate to show the trial court had an obligation to enforce the parties' pretrial stipulation to admission of the 294 exhibits. Their assertion that "[i]t is standard operating procedure in San Diego [County] Superior Court for parties to honor their JTRC positions and for counsel trying the case to rely on them" is unsupported by any evidence or legal authority and, in any event, does not show such stipulations supersede a trial court's ultimate authority to rule on the admissibility of evidence. (Evid. Code, § 310, subd. (a) ["All questions of law (including but not limited to questions concerning . . . the admissibility of evidence . . . ) are to be decided by the court . . . ."]; Evid. Code, § 352 [court in its discretion may exclude evidence if its probative value is substantially outweighed by probability that its admission will necessitate undue consumption of time]; Code Civ. Proc., § 128, subd. (a) [court shall have power to control, and provide for orderly

78

conduct of, proceedings before it]; *People v. Engram* (2010) 50 Cal.4th 1131, 1146 [trial court has inherent authority to efficiently administer judicial proceedings before it]; cf. *California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 19–20 [trial court may exercise its Evid. Code § 352 power on its own initiative to manage trial efficiently and avoid undue consumption of time].)  By so arguing, Cross-defendants have not carried their burden on appeal to present a substantive legal argument, containing citations to the evidence in the record and supporting legal authorities, showing the trial court erred, and therefore have, in effect, waived or forfeited their contention on appeal.[11]

In any event, assuming arguendo the trial court erred by not enforcing the parties' pretrial stipulation to admission of the 294 exhibits, Cross-defendants have failed to present any substantive legal analysis showing that the purported error was prejudicial.  (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Cassim*, *supra*, 33 Cal.4th at pp. 800–802; *Watson*, *supra*, 46 Cal.2d at p. 836.)  At most, they argue, again in a conclusory manner, that the jury's purported inconsistent verdict (which inconsistency we concluded above was not shown by Cross-defendants) reflected its confusion about the evidence, about the law, and how to apply legal concepts to the evidence.  By failing to present any substantive legal argument on the issue of prejudice, Cross-defendants have not carried their burden on appeal to affirmatively show prejudicial (i.e., reversible) error.  (*Pool*, *supra*, 42 Cal.3d at p. 1069; *Citizens for Open Government*, *supra*, 205 Cal.App.4th at pp. 308–310.)

---

11    See footnote 7 above for supporting case citations.

*Willis's Testimony Regarding Her Pretrial Admissions*

In their Argument 14, Cross-defendants contend that the trial court erred by allowing Willis and McCall to testify, in effect, that their pretrial admissions had been procured through bullying and rushing by Cross-defendants. They also argue that the trial court wrongly criticized them in the jury's presence by commenting that some of their requests for admission (RFAs) called for expert opinion or speculation. They also complain that the court did not admit all of the RFA admissions in evidence as exhibits.

A

*Procedural background.* Before trial, Cross-defendants served RFAs on Willis and McCall and used their admissions to certain RFAs in cross-examining them at trial. Pavone asked McCall whether he had served on her a number of RFAs as part of the discovery process. McCall answered: "Hundreds." Pavone stated, "Okay," and then asked her a question regarding a specific RFA. The trial court ruled that Pavone could read that RFA admission, but that the jury would not receive a copy of it. The court later precluded Pavone from including McCall's verification for each of her RFA admissions, noting that she had made only one verification for all of her responses to the RFAs served on her. The court stated in part: "What I've agreed to do, at Mr. Pavone's request, instead of [the jurors] having to look at hundreds of these—[¶] You said there were hundreds?" McCall answered: "Hundreds." The court continued: "Instead of you looking at hundreds of these requests, I agreed to segregate them out so we could show you them one at a time just so we wouldn't be here for an eternity. But the verification that's on here only appears one time." It continued: "[T]he document is a little misleading because it makes it look like they verified every single one

80

and signed off on every single question. Not the case. Okay? There's only one verification at the very end. [¶] And there's a whole bunch of procedure, but I can't feel that I can intervene at this point, but I just didn't want you to be misled. [¶] Are you okay with that, Mr. Pavone? That's the way it goes?" Pavone answered: "That is, but—it's fine."

Pavone continued his cross-examination of McCall, asking her whether it was her signature under the RFA verification language. McCall answered: "I read the hundreds of requests for admissions. I answered the hundreds of requests for admissions. I signed the very last page saying that I read them all. Yes." When Pavone asked McCall whether she admitted the RFA that Stoffel was trying to capture some of the Trust assets for himself, the court interjected: "Well, you know, some of these call for expert opinion, and some of these call for speculation. So they are not running the case. You're running the case, Mr. Pavone. [¶] . . . [¶] Just to be fair to them, some of these are defective." Pavone replied: "They should have drawn objections then." The court stated: "All right. You admitted. You admitted. [¶] I'm not -- you can use them the way you want. [¶] . . . [¶] I'm just making that comment. Okay."

During his cross-examination of Willis, Pavone asked her about her admission to a specific RFA and whether she had the benefit of representation by counsel at the time. Willis confirmed that she had counsel at the time, adding that "I thought that I was protected by having counsel review your thousands and hundreds and hundreds of discoveries to help me through the process. So I did rely on my counsel when responding to these RFAs, yes." Pavone replied, "Okay," and continued his questioning of her regarding the particular RFA admission.

81

B

*Analysis.* Cross-defendants argue that by allowing Willis and McCall to testify regarding the "hundreds" or "thousands" of RFAs served on them, the trial court, in effect, allowed them to portray to the jury that their admissions were the result of bullying or rushing by Cross-defendants.[12] However, Cross-defendants have not carried their burden on appeal. First, to the extent Cross-defendants complain about the characterization by Willis or McCall of their RFAs and, in particular, the number of RFAs served on them as being in the "hundreds" or "thousands," they have waived or forfeited that argument by their failure to timely object below to that testimony. Likewise, to the extent Cross-defendants argue the court erred by commenting that some of their RFAs called for expert opinion or speculation, they have waived or forfeited that argument by their failure to timely object below to those comments by the court. If a party does not timely object to admission of evidence, that party is generally precluded from challenging on appeal its admission and is deemed to have waived or forfeited that purported error. (Evid. Code, § 353; *Delgado, supra,* 2 Cal.5th at p. 580; *Waidla, supra,* 22 Cal.4th at p. 717; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726.)

Second, to the extent Cross-defendants also complain that the trial court "legitimized" Willis's and McCall's characterizations of the RFAs by repeating the "hundreds" characterization or otherwise and/or did not admit all RFA admissions as exhibits, they do not show they objected to the court's

---

[12]     We note that Cross-defendants concede that they served 141 RFAs on McCall. Accordingly, her characterization of the RFAs as constituting "hundreds" may not have been literally true, but instead may be viewed as exaggeration or hyperbole. We further note that Willis's "thousands" characterization clearly was exaggeration or hyperbole.

statements and/or, more importantly, do not present any substantive legal argument with citations to supporting legal authority showing the trial court abused its discretion in discussing the RFAs.  As discussed in section VIII(B) above, a trial court has the ultimate authority to rule on the admissibility of evidence and control the proceedings before it.  (Evid. Code, § 310, subd. (a); *id.*, § 352; Code Civ. Proc., § 128, subd. (a); *People v. Engram*, *supra*, 50 Cal.4th at p. 1146; *California Crane School, Inc. v. National Com. for Certification of Crane Operators*, *supra*, 226 Cal.App.4th at pp. 19–20.) Finally, they do not present any substantive legal argument on the issue of prejudice and simply argue, in a conclusory manner, that the purported errors were prejudicial.  By so doing, they have not carried their burden on appeal to present a substantive legal argument, containing citations to the evidence in the record and supporting legal authorities, showing the trial court erred and that its errors were prejudicial, and therefore have, in effect, waived or forfeited their contention on appeal.[13]  Accordingly, we need not, and do not, address the merits of Cross-defendants' contention in Argument 14 that the court prejudicially erred.

X

*Limitations on Use of Exhibits*

In their Argument 15, Cross-defendants contend that the trial court erred by limiting their use of exhibits and, in particular, allowing them to only show to the jury those exhibits that it excluded as inadmissible.

---

[13]     See footnote 7 above for supporting case citations.

## A

In their appellants' brief, Cross-defendants list over 50 exhibits that the court excluded from evidence and allowed them to only show to the jury, citing concerns regarding jury deliberations, defense objections, and Evidence Code section 352. In so ruling, the court stated: "[T]hey can get a feel for what it's about, but I just worry that they'll spend an inordinate amount of time on these documents. So you—go through with her testimony. They'll have her testimony, and they will have gotten a feel for the document. Whether it goes back [to the jury deliberation room] is a different issue."

## B

Cross-defendants argue that the court was "misguided" and erred by its exclusion of many of their exhibits from evidence because "the jury suffered not from too much information, but too little." However, in so arguing, they wholly omit any discussion of the court's discretion under Evidence Code section 352, which it cited in making its ruling. Evidence Code section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In excluding evidence pursuant to Evidence Code section 352, the court need not make findings or expressly recite its weighing process or that it has weighed the factors so long as the record as a whole shows the court understood and undertook its obligation to perform the weighing process. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 599.) A trial court's exercise of discretion under Evidence Code section 352 "will be disturbed on appeal only if the trial court exercised it in an arbitrary, capricious, or patently absurd

84

manner resulting in a manifest miscarriage of justice.  [Citation.]" (*Boeken v. Philip Morris, Inc., supra, 1*27 Cal.App.4th at p. 1685 (*Boeken*).)

Here, Cross-defendants have not carried their burden on appeal to show the court abused its discretion under Evidence Code section 352 by excluding from evidence the 50 or more exhibits listed in their appellants' brief.  In particular, they have not made any attempt to show that no rational judge could conclude that it would consume an undue amount of time and/or confuse the jury if those exhibits were admitted in evidence and available for their review during deliberations.[14]  (*Boeken*, *supra*, 127 Cal.App.4th at p. 1686 [abuse of discretion standard applies in reviewing trial court's discretionary exclusion of evidence under Evid. Code, § 352].)  In addition, they have again failed to present any substantive argument showing, and merely argue in a conclusory manner, that they were prejudiced by the court's exclusion of those exhibits.  Accordingly, we need not, and do not, address the merits of their contention.[15]

---

[14]    At most, Cross-defendants argue, in a conclusory manner, that "[t]here is no code section limiting parties to a fleeting electronic image of a document on a screen; documents are either admissible or they are not.  (Evid. Code, §§ 140, 210.)"  By so arguing, they wholly ignore the trial court's discretion under Evidence Code section 352 to exclude evidence that may be relevant, but inadmissible for other reasons.

[15]    See footnote 7 above for supporting case citations.

XI

*Admission of Willis's Testimony Criticizing*
*Cross-defendants' Legal Representation*

In Argument 16, Cross-defendants contend that Willis's failure to designate an expert witness to testify regarding the professional skills of attorneys precluded her, as a lay person, from criticizing their representation of her during her testimony.

A

Before trial, Cross-defendants filed an in limine motion asking the court to exclude any testimony by Willis and her sisters criticizing their professional skills in representing Willis. In particular, their motion listed 100 specific criticisms made by Willis and her sisters regarding their representation and, citing Evidence Code section 720, argued such criticism could only be made by an expert witness, which Willis had failed to designate.[16] Without citation to the record on appeal, Cross-defendants represent that the court denied their in limine motion and then allowed Willis and her sisters to criticize Cross-defendants' representation of Willis during their testimony at trial. For purposes of disposing of their contention, we accept their representation that the court denied their in limine motion

---

[16]   For example, Cross-defendants cite criticism that "Pavone . . . did a very poor job." In their appellants' brief, Cross-defendants attach an appendix titled, "Analysis of Defense Criticisms," that describes 21 instances of criticism made at trial regarding their representation of Willis. However, a cursory chart, such as that attached appendix, cannot substitute for substantive argument with supporting legal authority that is required for Cross-defendants to carry their burden on appeal.

and allowed Willis and her sisters to testify in a manner that criticized the professional skills exercised by Cross-defendants in representing Willis.

B

However, once again, Cross-defendants have waived or forfeited their contention by failing to present substantive legal argument with citations to the evidence and supporting legal authority showing the trial court abused its discretion by denying their in limine motion, and, furthermore, have failed to carry their burden on appeal to show the court so erred. At most, they cite to Evidence Code section 720 and "related rules." Evidence Code section 720 simply states the general proposition that a person is qualified to testify as an expert if he or she "has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Contrary to Cross-defendants' assertion, there is nothing in the language of Evidence Code section 720 that "require[s] expert testimony" for the "sorts of conclusions" made by Willis and her sisters at trial. Furthermore, the trial court here could have reasonably exercised its discretion to admit Willis's testimony regarding Cross-defendants' legal services on the ground that it was the opinion of a lay witness rationally based on her perception and would be helpful to the jury to clearly understand her testimony. (Evid. Code, § 800; cf. *People v. DeHoyos* (2013) 57 Cal.4th 79, 130–131.) Finally, Cross-defendants again make only a conclusory argument that the purported error by the court was prejudicial, and, in so doing, have not carried their burden on appeal to affirmatively show prejudicial error requiring reversal of the judgment.[17] Accordingly, we need not, and do not, address the merits of their contention.

---

[17] See footnote 7 for supporting case citations.

87

## XII

### *Other Evidentiary Rulings*

In Argument 17, Cross-defendants contend the trial court erred by making other evidentiary rulings. Specifically, they argue the court erred: (1) in its response to Willis's opening statement regarding Pavone; (2) by excluding their charts and pictorial displays that would have explained the evidence; and (3) by excluding the Larsen book.

Given the dearth of substantive legal analysis with citation to the evidence and supporting legal authority and the failure to show that any of the purported specific errors were, either singly or cumulatively, prejudicial, we first briefly discuss the purported errors of which Cross-defendants complain and then conclude they have waived or forfeited those assertions. In their first argument, Cross-defendants complain that the court erred in responding to Willis's opening statement. In her opening statement, Willis referred to Pavone's 20-year career as a trial attorney and then stated: "He will use every trick that he's learned the past 20 years to make you believe exactly what he wants you to believe." Pavone did not object to that statement or request a curative admonition, and, as a result, waived or forfeited any challenge on appeal to Willis's statement. (*Cassim*, *supra*, 33 Cal.4th at pp. 794–795; *Rayii*, *supra*, 218 Cal.App.4th at pp. 1411–1412; *Garcia*, *supra*, 204 Cal.App.4th at p. 148.) Rather, Pavone waited until his testimony to respond, testifying: "[I]n contrast to playing tricks or playing dirty tricks, credibility is important for a trial lawyer. . . . [¶] The way I try to establish credibility is that I—" The court then interjected and admonished the jury:

> "Ladies and gentlemen, one of your jobs, as I told you, and
> I'll reemphasize it, is to determine the credibility of
> witnesses. I'm not going to let any witness get up on the

88

witness stand and tell you how credible they are. That's your job. [¶] So I'm going to tell Mr. Pavone, it's time to stop talking about how credible you are. I'm not saying he doesn't believe it or whatever. What I am saying is that's your job. [¶] And so I'm telling you guys, you're not going to get up on the witness stand and get up and say, 'Here's the reason you should [find] that I'm a credible person.' "

Cross-defendants concede the court correctly admonished the jury that witnesses generally cannot testify regarding their own credibility, but argue that during her opening statement Willis improperly suggested Pavone would use tricks to fool the jurors. They argue that the court's admonishment was not sufficiently curative of Willis's improper statement and it should have, in addition, given Pavone greater latitude during his testimony to respond to Willis's opening statement and should have admonished the jury that her opening statement allowed him to so testify. By also arguing in a conclusory manner and failing to make any substantive legal argument with citation to the evidence and supporting legal authority showing the court abused its discretion and that the purported error was prejudicial, Cross-defendants waived or forfeited this argument.

In their second argument, Cross-defendants complain that although the court admitted in evidence some of their charts and pictorial displays, it excluded many of the charts and pictorial displays that they developed to help the jury to understand P&F's legal services regarding the underlying cases. They argue their excluded charts and pictorial displays were relevant to help the jury understand the evidence. In a conclusory manner, they assert the cumulative impact of "[t]hese sorts of decisions by the trial court" prejudiced them and deprived them of a "fair chance to prove that their case was corroborated and the other side's case was essentially a conspiracy theory." By arguing in a conclusory manner and failing to make any

89

substantive legal argument with citation to the evidence and supporting legal authority showing the court abused its discretion and that the purported error was prejudicial, Cross-defendants waived or forfeited this argument.

In their third argument, Cross-defendants claim that the court abused its discretion by excluding from evidence Larsen's book, titled "Guardianship: How Judges and Lawyers Steal Your Money." Apparently to refute assertions by Willis and her sisters that Cross-defendants misrepresented to them that third parties, including the probate court and probate "insiders," were conspiring to steal Teresa's estate, Cross-defendants sought to admit Larsen's book to support their position at trial that they reasonably believed there was a conspiracy to steal Teresa's estate. However, Cross-defendants make only a conclusory argument that the court abused its discretion by excluding the Larsen book from evidence. In so doing, Cross-defendants have not carried their burden on appeal to show the court abused its discretion under Evidence Code section 352 or otherwise by excluding that book from evidence. In particular, they have not made any attempt to show that no rational judge could conclude that it would consume an undue amount of time and/or confuse the jurors if that book was admitted in evidence and available for their review during deliberations. As a result, they have waived or forfeited their contention and also failed to carry their burden on appeal to affirmatively show the court erred. In addition, they have again failed to present any substantive argument showing, and merely argue in a conclusory manner, that they were prejudiced by the court's exclusion of that evidence.

Because Cross-defendants have waived or forfeited all three arguments in Argument 17, we need not, and do not, address the merits of their contentions.[18]

---

[18]    See footnote 7 above for supporting case citations.

## XIII

### *Willis's Purported Inflammatory Comments*

In their Argument 18, Cross-defendants contend the court erred by allowing Willis to make various inflammatory comments that impugned Pavone's character. After citing general case law regarding their right to a fair trial and the law's disfavor of inflammatory character evidence, they simply argue: "The trial here was infected with prejudicial error by the defense tactic of blurting out improper and inflammatory information [citations], while being insulated from being impeached. [Citations.]" In so doing, they again argue in a conclusory manner without discussing the substance of the specific purported inflammatory statements made by Willis and without showing that they timely objected to such statements or that the court abused its discretion by overruling any such objections. Accordingly, we conclude that Cross-defendants have waived or forfeited their contention on appeal and have also failed to carry their burden on appeal to show the court abused its discretion. (*Cassim*, *supra*, 33 Cal.4th at pp. 794–795; *Rayii*, *supra*, 218 Cal.App.4th at pp. 1211–1212.) Accordingly, we need not, and do not, address the merits of their contention.[19]

## XIV

### *Order Granting Nonsuit Motion*

In their Argument 19, Cross-defendants contend the court erred by granting the nonsuit motion filed by Jerne and McCall. In a conclusory manner, they argue the court erred by precluding the jury from deciding when Jerne and McCall had received Pavone's emailed notice of P&F's lien

---

[19]   See footnote 7 above for supporting case citations.

because "[b]oth defendants gave conflicting and implausible explanations as to their knowledge and receipt of this letter. [Citations.]"

Our review of the record shows that both Jerne and McCall testified they could not remember any specific date when they read Pavone's March 1, 2017 e-mail regarding P&F's purported lien on the Oliver property sale proceeds.[20] In support of their nonsuit motion, Jerne and McCall represented to the court that they had testified at trial that they had no knowledge of P&F's lien prior to the distribution to them of the Oliver property sale proceeds. They further represented that there was no evidence showing they had knowledge of P&F's lien prior to receiving Pavone's e-mail.

In granting Jerne and McCall's nonsuit motion, the court concluded that there was no affirmative evidence presented by Cross-defendants to support a finding Jerne and McCall had read Pavone's lien email prior to their receipt of the Oliver property sale proceeds. The court stated that Cross-defendants could not rely solely on speculation that they had knowledge of the lien before their receipt of the proceeds. The court further concluded that the mere receipt by Jerne and McCall of the checks from the escrow company could not constitute intentional interference by them with P&F's interest in the sale proceeds as required for the conversion and theft causes of action against them. The court concluded that the evidence did not show Jerne or McCall took any action to prevent Cross-defendants from having access to the sale proceeds, noting that the proceeds "simply came to them." Regarding the receipt of stolen property cause of action, the court

---

20  Pavone's e-mail, dated March 1, 2017, was addressed to Willis and copies of it were apparently sent to, inter alia, Jerne and McCall. The text of that e-mail stated in its entirety: "Please see attached letter and supporting lien."

92

concluded there was no evidence showing Jerne or McCall knew the Oliver property sale proceeds were "stolen." Accordingly, the court granted Jerne's and McCall's nonsuit motion and dismissed them from the case.

"A defendant is entitled to a nonsuit if the trial court determines the evidence presented by plaintiff is insufficient to permit a jury to find in his or her favor as a matter of law." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 650 (*IIG Wireless*).) Accordingly, in determining whether a nonsuit motion should be, or should have been, granted, the substantial evidence standard of review applies both at the trial and appellate court levels. (*Ibid*.; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214–1215 (*Castaneda*).)

In their appellants' brief, Cross-defendants argue, again in a conclusory manner, that the trial court erred by granting Jerne's and McCall's nonsuit motion because there was substantial evidence to support a finding they had notice of the lien before they received the Oliver property sale proceeds. Specifically, Cross-defendants argue there was such substantial evidence based on the "ordinary reliability of email, along with [Jerne's and McCall's] bumbling denials." However, that argument does not constitute an affirmative showing of substantial evidence to support a finding that Jerne and McCall had knowledge of P&F's lien at the time they received the sale proceeds. Accordingly, Cross-defendants have not carried their burden on appeal to show the trial court erred by granting Jerne's and McCall's nonsuit motion. (Cf. *IIG Wireless, supra,* 22 Cal.App.5th at pp. 650–651; *Castaneda, supra,* 41 Cal.4th at pp. 1214–1215.)

XV

*Denial of Motions for New Trial and JNOV*

In their Argument 20, Cross-defendants contend the trial court erred by denying their motions for new trial and judgment notwithstanding the verdict (JNOV). In another conclusory argument, they simply assert Willis

did not submit any "meaningful" response to their "eleven grievances" cited in support of their motions. In so doing, they do not present any substantive legal analysis with citations to the evidence and supporting legal authority showing the court erred by denying their motions. As a result, they have waived or forfeited their contention and also failed to carry their burden on appeal to affirmatively show the court erred. Accordingly, we need not, and do not, address the merits of their contention.[21]

## XVI

### *Ruling on Demurrers*

In their Argument 21, Cross-defendants contend the trial court erred by overruling their demurrers to three causes of action alleged in Willis's cross-complaint. However, in so contending, they simply "incorporate the arguments made in the lower court." Such an argument on appeal is inappropriate: "It is inappropriate for an appellate brief to incorporate by reference arguments contained in a document filed in the trial court. [Citation.] Such practice does not comply with the requirement that an appellate brief 'support each point by argument and, if possible, by citation of authority.' (Cal. Rules of Court, rule 8.204(a)(1)(B).)" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 854.) Accordingly, we disregard Cross-defendants' attempt to incorporate by reference arguments they made below in support of their demurrers. (*Ibid.*; see also, *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 ["It is well settled that the Court of Appeal does not permit incorporation by reference of documents filed in the trial court."].) As a result, they have waived or forfeited their

---

21      See footnote 7 for supporting case citations.

contention and also failed to carry their burden on appeal to affirmatively show the court erred.[22]

## XVII

### *Prejudgment Interest*

In their Argument 22, Cross-defendants contend the trial court erred by denying their postjudgment motion for an award of prejudgment interest on P&F's award of $284,000 on its common count for services rendered.  In particular, they argue the court erred by concluding the amount Willis owed P&F for services rendered was uncertain or incapable of being made certain by calculation within the meaning of Civil Code section 3287, subdivision (a) (§ 3287(a)).

### A

*Applicable law*.  Section 3287(a) provides:

> "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ."

"Under [section 3287(a)] the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach [or other accrued cause of action] and a liquidated claim.  [Citation.]" (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828.)  An award of section 3287(a) prejudgment interest is not dependent on the type of cause of action such as contract or tort, "but rather whether the damages were readily ascertainable." (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 795.)  "Furthermore, a

---

22     See footnote 7 above for supporting case citations.

defendant's denial of liability does not make damages uncertain for purposes of . . . section 3287. [Citations.]" (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958 (*Wisper*); *Credit Managers' Assn. v. Brubaker* (1991) 233 Cal.App.3d 1587, 1595.) "The test for recovery of [section 3287(a)] prejudgment interest . . . is whether '*defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount.' " (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1789.) *Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, at page 1060, stated:

> "Damages are deemed certain or capable of being made certain within the provisions of [section 3287(a)] where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage."

In *Wisper*, we stated:

> "[I]t is clear that . . .section 3287 looks to the certainty of the damages suffered by the plaintiff, rather than to a defendant's ultimate liability, in determining whether prejudgment interest is mandated. An award of prejudgment interest is intended to make the plaintiff whole 'for the accrual of wealth which could have been produced during the period of loss.' [Citation.]" (*Wisper*, *supra*, at p. 958.)

Therefore, "prejudgment interest is awarded only when the sum is liquidated within the meaning of the statute." (*Fireman's Fund Ins. Co. v. Allstate Co.* (1991) 234 Cal.App.3d 1154, 1172 (*Fireman's Fund*).)

However, prejudgment interest is not appropriate when the amount of damages must be judicially determined from conflicting evidence and is not ascertainable from the information provided by the creditor. (*Lineman v. Schmid* (1948) 32 Cal.2d 204, 212 ["interest is not allowable when damages

96

cannot be computed except on conflicting evidence"]; *Fireman's Fund*, *supra*, 234 Cal.App.3d at pp. 1172–1173.) "Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (*Wisper*, *supra*, 49 Cal.App.4th at p. 960.) For example, where an accounting is required to arrive at a sum justly due, prejudgment interest is not allowed. (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 908.) Furthermore, "cases indicate that where there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award, that fact militates against a finding of the certainty mandated by [section 3287(a)]." (*Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 435 (*Polster*).) "The greater the disparity between the complaint and the damages, however, the less likely prejudgment interest is appropriate." (*Wisper*, at p. 961.) On appeal, we independently determine whether damages are ascertainable for purposes of a section 3287(a) prejudgment interest award. (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 391.)

B

*Analysis.* Here, the original complaint filed by LOBP sought $507,361 in unpaid legal fees. In their operative FAC, LOBP, along with P&F, again sought $507,361 for the value of legal services rendered to Willis. In comparison, the jury ultimately awarded P&F only $284,000 on its common count for services rendered. Like the court in *Polster*, we conclude "[t]his large discrepancy is inconsistent with a sum certain or capable of being made certain at the time" the services were rendered or when the common count claim otherwise arose. (*Polster*, *supra*, 164 Cal.App.3d at p. 436.) Furthermore, the amount of damages to be awarded on P&F's common count for services rendered required a determination by the jury. Willis asserted

97

the amount of legal fees sought by P&F was unreasonable and presented evidence at trial that had the effect of reducing the amount of the value of legal services provided from the $507,361 amount sought by P&F in the FAC to only the $284,000 amount determined by the jury to be the reasonable value of its services.  Accordingly, we conclude the amount due P&F was not a sum certain, or capable of being made certain by calculation, within the meaning of section 3287(a).  (Cf. *Polster*, at p. 436.)  Therefore, the trial court correctly denied Cross-defendants' motion for section 3287(a) prejudgment interest.

Cross-defendants primarily rely on one California case in support of their argument that the damages awarded on their common count for services rendered were certain, or capable of being made certain by calculation, within the meaning of section 3287(a).  However, *Cox v. McLaughlin* (1881) 76 Cal. 60, cited by Cross-defendants, rather than supporting their position, supports the conclusion that the damages awarded are not liquidated for purposes of section 3287(a) prejudgment interest.  In *Cox*, the court stated that, "as a general principle, [prejudgment] interest is not allowed on unliquidated damages or demands," and the term " 'unliquidated damages' " applies to tort cases, as well as "cases upon a *quantum meruit*, for goods sold and delivered or services rendered." (*Id.* at p. 67.)  Here, P&F's common count for the value of its legal services rendered to Willis is more akin to, if not the same as, a common count for quantum meruit than to a liquidated claim based on an undisputed amount or value of services rendered, such as damages for nonpayment of specific amounts due pursuant to a contract.  (See, e.g., *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 460 [elements of a common count allegation]; *Iverson, Yoakum, Papiano & Hatch v. Berwald* (1999) 76 Cal.App.4th 990, 996 [discussing common count for quantum meruit for reasonable value of

services rendered]; *Leoni v. Delany* (1948) 83 Cal.App.2d 303, 307–310 [discussing common count for reasonable value of services rendered]; cf. *Cox*, at pp. 68–69.) As the plaintiff did in *Cox*, P&F prevailed on its common count and not on its contract cause of action. (*Cox*, at pp. 69–70.) Accordingly, as in *Cox*, P&F's "services . . . were uncertain as to amount, character, value, and time of payment, until fixed by a verdict or findings of the court. They were not of a character to have a fixed or ascertainable market value. [¶] They could not be ascertained by computation, either in extent or value. [Willis] was not in default for not ascertaining that which . . . [she] could not ascertain except by an accord or by verdict, or its equivalent." (*Id*. at p. 70.)

Generally, a common count, such as a quantum meruit cause of action, involves a determination of the reasonable value of services rendered or other benefits conferred on a defendant, and the litigants usually dispute or contest that reasonable value. Therefore, courts often have held that in a quantum meruit case prejudgment interest cannot be awarded because the reasonable value was not a sum certain, or capable of being made certain. *Parker v. Maier Brewing Co.* (1960) 180 Cal.App.2d 630, at page 634, stated: "It is well established that where there is no express contract and the action is in *quantum meruit* to recover the reasonable value of services rendered, interest is not recoverable prior to judgment. [Citations.]" (Original italics.) *Continental Rubber Wks. v. Bernson* (1928) 91 Cal.App. 636, at page 638, stated: "In general, interest is not allowable on unliquidated demands for any period prior to judgment. This applies in cases founded in *quantum meruit* . . . ." (Original italics.) The general rule applies here because Willis did not simply dispute liability, but also disputed the reasonable value of services rendered by P&F in defending against its common count for services rendered. Accordingly, Cross-defendants have not carried their burden on appeal to show that P&F was entitled to an award of section 3287(a)

99

prejudgment interest on its $284,000 award on its common count for services rendered.[23]

## XVIII

### *Remaining Contentions*

In Arguments 23, 24, and 25, Cross-defendants contend: (1) P&F is the prevailing party entitled to its costs under Code of Civil Procedure section 1032, subdivision (a)(4) if it is awarded prejudgment interest (for which they argued in Argument 22); (2) they substantially complied with the parties' stipulation for redaction of sensitive information from the Agreement during the case; and (3) cumulative errors by the court require reversal of the judgment. However, we need not, and do not, address the merits of any of these arguments. First, we concluded above that Cross-defendants are not entitled to section 3287(a) prejudgment interest and, as a result, their total monetary award does not make them prevailing parties under Code of Civil

---

[23] Cross-defendants argue that, in any event, P&F should be entitled to prejudgment interest on at least $200,000 of its $284,000 award because Willis "acknowledged" during discovery that she owed P&F that amount. We conclude that argument is ill-founded and unsupported by any apposite case law. First, the two citations to the record on appeal in support of their assertion that Willis "acknowledged" during discovery that she owed P&F $200,000 do not provide any support for that assertion. Rather, the citation to page 3621 of Volume 7 of the appellants' appendix is simply to one page of a P&F invoice and their citation to page 4956 of Volume 9 of the appellants' appendix is simply to a blank title page, "Exhibit 488." Neither cited page provides any support for their assertion that Willis acknowledged, much less admitted, that she owed P&F $200,000 on its common count for services rendered. Second, neither of the two cases cited by Cross-defendants in support of their argument are apposite to this case or otherwise persuade us to reach a contrary conclusion. (See, e.g., *Marine Terminals Corp. v. Paceco, Inc.* (1983) 145 Cal.App.3d 991, 996 [defendant disputed its liability, but not amount of charges]; *Bott v. American Hydrocarbon Corp.* (5th Cir. 1972) 458 F.2d 229, 232 [prejudgment interest awarded to plaintiff for loans of money to defendant and for wages owed to him based on uncontested evidence].

Procedure section 1032, subdivision (a)(4) (e.g., "the party with a net monetary recovery"). Second, they do not cite any error by the trial court or Willis by which they are aggrieved parties regarding the purported stipulation for redaction of the Agreement and from which they have the right to appeal. Third, because we have concluded Cross-defendants have not carried their burden on appeal to show any single prejudicial error, there cannot be any cumulative prejudicial error. Accordingly, we reject Cross-defendants' final three contentions.

DISPOSITION

The judgment is affirmed. Respondent is entitled to her costs on appeal.


IRION, J.


WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.